[Civ. No. 55965  Second Dist., Div. Five. Mar. 28, 1980.]

MARION RAY WINDHAM, Plaintiff and Respondent, v.
BOARD OF MEDICAL QUALITY ASSURANCE, Defendant
and Appellant.

COUNSEL

George Deukmejian, Attorney General, and Lawrence C. Kuperman, Deputy Attorney General, for Defendant and Appellant.

Cohen & Ziskin, Terry S. Kaplan and Peter D. Collisson for Plaintiff and Respondent.

OPINION

KAUS, P. J.—The Board of Medical Quality Assurance (the Board) appeals from a judgment granting a peremptory writ of mandate ordering the Board to set aside and dismiss a disciplinary action against respondent, Doctor Marion Ray Windham, one of its licensees.

FACTS

Respondent was graduated from medical school in 1957 and, before moving to California, had been licensed to practice medicine in Mississippi and Louisiana. He was admitted to practice in California on November 2, 1972, where he started a psychiatric residency which he completed in 1975. Since then he has engaged in private practice, specializing in the area of forensic psychiatry.[1]

In 1973, that is after he had resided in California for some time, respondent was indicted in the United States District Court for the Southern District of Mississippi. The grand jury charged two violations of section 7201, title 26, United States Code. Count 1 pertained to the calendar year 1967, count 2 to the year 1968. The counts charged that with respect to each year respondent "did knowingly and wilfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America..., by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed...a false and fraudulent" income tax return. The 1967 income was understated by about $19,000, the 1968 income by nearly $65,000. With respect to each year it was alleged that the doctor

---

[1]Respondent had also graduated from the University of Mississippi Law School in 1964.

"then and there well knew" what his taxable income was. The total tax deficiency alleged was about $65,000. After a jury trial respondent was convicted in June 1973.[2] He was fined and placed on five years' probation. There is nothing in the record to indicate when the Board learned of the Mississippi convictions.

The accusation was filed in May 1977. It referred to the fact that section 2383 of the Business and Professions Code provides that the conviction of a felony constitutes unprofessional conduct.[3] It then recited that under section 490 the Board could suspend or revoke a license on the ground that the licensee had been convicted of a crime, if the crime was substantially related to the qualifications, functions or duties of the profession for which the license had been issued;[4] it concluded that respondent was subject to disciplinary action because of the 1973 Mississippi conviction for tax evasion.

Respondent filed a notice of defense pursuant to section 11506 of the Government Code. Of interest at this time is that he did not raise any defense based upon the passage of time between the finality of the Mississippi federal conviction and the commencement of the disciplinary proceedings. (Cf., *Bohn* v. *Watson* (1955) 130 Cal.App.2d 24, 36 [278 P.2d 454].) In fact no "new matter by way of defense" (Gov. Code, § 11506, subd. (a)(5)) was alleged.

The hearing took place on January 31, 1977. During a discussion between the administrative law judge and counsel concerning the admissibility of the court of appeals' opinion affirming respondent's conviction, counsel for respondent requested the court to take judicial

---

[2]The conviction was affirmed in *United States* v. *Windham* (5th Cir. 1974) 489 F.2d 1389, decided on February 20, 1974.

[3]Henceforth, unless otherwise noted, all statutory references are to the Business and Professions Code. Two separate chapters of that code are relevant to this proceeding. The first is chapter 3 of division 1.5 (§ 490 et seq.) which deals with the suspension and revocation of any license, certificate or registration in any profession regulated by the Business and Professions Code. (See § 475.) The other is chapter 5 of division 2 and particularly article 13 thereof, which covers the denial, suspension and revocation of certificates to practice medicine.

[4]The section which then provided for the constitutionally necessary nexus between the conviction and the qualifications to practice medicine was section 490. (See *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].) Section 2383, as it read at the time, did not on its face provide for such a nexus.

notice of the title and section of the United States Code under which his client had been convicted of "wilful and unlawful evasion of income taxes." The judge then said: "It gets down to the bottom line as to whether conviction of this section is moral turpitude or not." The deputy attorney general representing the Board replied: "No." He then explained that in his view it was not necessary to prove that section 7201 necessarily implied moral turpitude. In this he correctly relied on the fact that at the time in question section 2383 of the Business and Professions Code provided that "the conviction of either (1) a felony or (2) any offense, misdemeanor or felony, involving moral turpitude constitutes unprofessional conduct within the meaning of this chapter."[5] In answer to further questions the deputy made it clear that it was his contention that "the conviction for income tax evasion [was] substantially related to the profession, the practice of medicine."

We note, parenthetically, that we know of no constitutional requirement that in a proceeding such as this, discipline can only be imposed for acts or omissions involving moral turpitude. The constitutional requirement is, rather, the nexus between the act or omission and the respondent's fitness or competence to practice his profession. (*Newland v. Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].)

In any event, after offering evidence of the Mississippi conviction, the Board rested. The respondent then called his California probation officer who had supervised him here for a year and a half and who had nothing but nice things to say about him. Nevertheless, although his office had at one point recommended that the doctor's probation be terminated, "the Judge [in Mississippi] did not go along with that recommendation."

The next witness was respondent himself. He testified to facts from which one could conclude that he was rehabilitated. He also testified that he was particularly concerned about being disciplined inasmuch as in his practice of forensic psychiatry he was often called as a witness and he "would hate to be dragged through—every case that I have to

---

[5]Section 2383 was later substantially revised by the 1978 Legislature. The new language does not differentiate between felonies and misdemeanors and says nothing expressly about moral turpitude. Instead the section commences as follows: "The conviction of any offense, substantially related to the qualifications, functions and duties of a physician and surgeon constitutes, unprofessional conduct within the meaning of this chapter."

sit up and testify, I would have to go back through my background." In fact, however, he had never even been impeached with the conviction for tax evasion.

Cross-examination of respondent developed the previously noted fact that he was a law school graduate, that part of his practice was "with Medi-Cal," and that some of his fees as a forensic psychiatrist are paid out of public treasuries. Attempts to prove that the income which respondent had failed to report in 1967 and 1968 was derived from then illegal abortions were stopped by the administrative law judge who ruled that the matter was "pretty remote" and that, in any event, the issue was not how respondent had acquired the income which he had failed to report but whether or not it was reportable.

Near the end of the hearing the following colloquy occurred:

"ADM. LAW JUDGE: The posture of the present case is that the respondent has been convicted of a felony?

"MR. ROSS: Yes, sir.

"ADM. LAW JUDGE: That in itself is the grounds?

"MR. ROSS: Yes, sir.

"ADM. LAW JUDGE: Beyond that, the agency does not claim that it involves moral turpitude?

"MR. KUPERMAN: Well, we're not attempting to prove that at this time."

After the matter was submitted the administrative law judge ordered the respondent's license to be suspended for fifteen days, but stayed the suspension and placed him on probation for three years. The Board, however, did not adopt the proposed decision and later decided the case itself. In connection with the hearing before the Board, respondent himself filed a declaration which injected into the record what had been kept out by the hearing officer: the source of the income which had not been declared in the late 60's.[6] In any event the Board, in December

---

[6] It came in the form of a declaration of a Mississippi attorney which read in part as follows: "I can assure the members of the Board that if Dr. Windham had been doing

1977, issued its own decision in which it ordered respondent's license revoked, but stayed the revocation and placed him on probation for a total of three years.[7] In its findings the Board found that respondent's Mississippi conviction "does involve moral turpitude and it is substantially related to the qualifications, functions or duties of the business or profession for which the respondent is licensed." The order imposing discipline was based on the Board's determination that the respondent had been guilty of unprofessional conduct in "that he has violated sections 2383 and 490 of the Business and Professions Code...."

The petition for a writ of mandate was filed in February 1978 and after a hearing, the superior court made certain findings relevant to this appeal. Thus, it found that "[n]o evidence was presented to the Board to support the Board's findings that Dr. Windham's conviction (a) involved moral turpitude, (b) was substantially related to the qualifications, functions or duties of the business or profession for which he was licensed, or (c) constituted unprofessional conduct." Further: "The weight of evidence did not support the Board's findings that Dr. Windham's conviction of income tax evasion constituted (a) conduct involving moral turpitude, (b) unprofessional conduct, or (d) [*sic*] the conviction of an offense that substantially related to the qualifications, functions or duties of the business or profession for which Dr. Windham was licensed." In addition, the court found that the "weight of evidence presented to the Board was that Dr. Windham had become totally rehabilitated since his conviction of income tax evasion involving his federal income tax return for the year 1968" and that "[n]o evidence was introduced to show that the Board took into account all or any competent evidence of Dr. Windham's rehabilitation."

Other relevant findings will be discussed in connection with the various points raised on appeal. In its conclusions of law the trial court

---

abortions and if there was any evidence to that effect that under the social attitudes of the people of Mississippi he certainly would have been prosecuted. The only evidence, although indirect, came from his former medical partner who testified at his income tax trial by saying that 'well I would say so' which is not saying that Dr. Windham did do abortions. It should also be brought to the attention of the Board that this one witness, his former medical partner, Dr. Robert P. Meyers, had been arrested and tried for doing abortions himself at which there was no implication whatsoever of Dr. Windham."

[7]The order contains an obvious clerical omission in that it neglects to provide that at the end of the period of probation the stay of the revocation of the doctor's certificate is to become permanent.

found that the Board's findings were not supported by the evidence, that the discipline imposed was an abuse of discretion, that a violation of section 7201 of title 26 United States Code "without any evidence connecting the factual basis of said conviction to the qualifications, functions or duties of a licensed physician and surgeon, does not constitute a showing of unprofessional conduct," that the "crime of federal income tax evasion...is not substantially related to the qualifications, functions or duties of a licensed physician or surgeon" and that the decision of the Board was substantially affected by its erroneous reliance on a repealed version of section 1360 of title 16 of the California Administrative Code.

Judgment granting a peremptory writ of mandate was entered in conformity with the findings and conclusions.

## DISCUSSION

■ In its appeal the Board presents a single argument: "The felony of income tax fraud is substantially related to the qualifications of the practice of medicine." While we fully agree with that proposition and while it is obvious that many of the trial court's findings and conclusions are based on a contrary assumption, we shall have to deal with other issues raised by respondent.

The truth of the Board's basic proposition rests four-square on common sense and *Kirby* v. *Alcoholic Bev. etc. App. Bd.* (1969) 270 Cal.App.2d 535 [75 Cal.Rptr. 823], which establishes—*In re Hallinan* (1954) 43 Cal.2d 243 [272 P.2d 768] notwithstanding—that a conviction of tax evasion under section 7201 necessarily involves moral turpitude.[8] Of course, the fact that a conviction under section 7201 imports moral turpitude is but a stepping stone to the necessary finding under the applicable California sections—490 and 2383—both of which demand a nexus between the crime and the licensed activity.[9]

---

[8] The *Kirby* court found that recent federal decisions had undermined the foundation of *Hallinan*.

[9] Section 490 permits the suspension of a license on the ground of conviction of a crime only "if the crime is substantially related to the qualifications, functions, or duties of the business or profession for which the license was issued,...." Section 2383 as it read until 1978 did not, on its face, demand such a nexus or even moral turpitude generally, provided that the crime in question was a felony. As noted earlier the omission has since been rectified. (see fn. 5 *supra*.)

Respondent argues that while tax fraud may adversely reflect on his moral character, it is not the type of transgression which reflects on his professional qualifications, functions or duties. We disagree.

First of all, we find it difficult to compartmentalize dishonesty in such a way that a person who is willing to cheat his government out of $65,000 in taxes may yet be considered honest in his dealings with his patients. In this connection, however, we should point out that today's doctor deals financially with the government—state, local and federal —in many ways that have nothing to do with his own personal tax obligation. We also point out that respondent's chosen specialty— forensic medicine—demands a high degree of honesty in reporting concerning examinations and in testifying, if called upon to do so.

Quite apart from these contacts with various governmental agencies, most practicing physicians deal with various private insurance carriers on a basis which demands utmost honesty in reporting. Above all, however, there is the relation between doctor and patient. It is unnecessary to describe the extent to which that particular relationship is based on utmost trust and confidence in the doctor's honesty and integrity. We held in *Matanky* v. *Board of Medical Examiners* (1978) 79 Cal.App.3d 293, 305 [144 Cal.Rptr. 826] that "[i]ntentional dishonesty,... demonstrates a lack of moral character and satisfies a finding of unfitness to practice medicine." We are not disposed to limit what we said in that case to the narrow facts which were then before us. Thus, although we recognize the role of the trial court as a fact finder (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144-146 [93 Cal.Rptr. 234, 481 P.2d 242]), it appears clear that several of its findings and conclusions were influenced by the expressed erroneous view that dishonesty vis-à-vis the government is unrelated to the qualifications essential to the practice of medicine.[10]

While the Board is clearly correct on the question of "nexus,"—its only point on appeal—respondent has other quarrels with the Board's decision, most of which found a receptive ear in the trial court. We shall deal with them briefly.

As already noted, section 490 makes it necessary that the crime be substantially related to the qualifications, functions or duties of the business or profession for which the license sought to be revoked or sus-

---

[10]In particular, the various findings to the effect that the convictions for income tax evasion were not related to the respondent's qualifications to practice medicine and the resulting conclusions that proof of the convictions did not constitute a showing of unprofessional conduct, are plainly erroneous.

pended was issued—again the nexus problem. Section 481 directs each board which administers discipline to develop criteria to aid it when considering the denial, suspension or revocation of a license, "to determine whether a crime or act is substantially related to the qualifications, functions, or duties of the business or profession it regulates." Pursuant to that directive the then Board of Medical Examiners promulgated section 1355 of title 16 of the California Administrative Code which we reprint below.[11] That section was superseded in 1977 by section 1360, which we also copy in the margin.[12] Respondent's claim is twofold: First, he asserts that section 1360, the applicable section simply does not cover income tax evasion. Referring to the sections' reference to chapter 5, division 2 of the Business and Professions Code—the chapter relating to the practice of medicine—it is claimed that "[n]o known medical school curriculum contains a course in 'Federal Income Taxation.'"

Nevertheless, section 1360 easily covers respondent's conviction. We have already pointed out why income tax evasion "to a substantial degree. . .evidences present or potential unfitness of a person holding a license, certificate or permit to perform the functions authorized by the license, certificate or permit in a manner consistent with the public health, safety or welfare." As far as the section's reference to chapter 5,

---

[11]"1355. Substantial Relationship Criteria. For the purposes of denial, suspension, or revocation of a license, certificate or permit pursuant to Division 1.5 (commencing with Section 475) of the Business and Professions Code, a crime or act shall be considered to be substantially related to the qualifications, functions or duties of a person holding a license, certificate or permit under Chapter 5 of Division 2 of the Business and Professions Code if to a substantial degree it evidences present or potential unfitness of a person holding a license, certificate or permit to perform the functions authorized by his license, certificate or permit in a manner consistent with the public health, safety, or welfare. Such crimes or acts shall include but not be limited to those involving the following:

"(a) Violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate any provision or term of Chapter 5, Division 2 of the Business and Professions Code.

"(b) Conviction of a crime involving fiscal dishonesty."

[12]"1360. Substantial Relationship Criteria. For the purposes of denial, suspension or revocation of a license, certificate or permit pursuant to Division 1.5 (commencing with Section 475) of the code, a crime or act shall be considered to be substantially related to the qualifications, functions or duties of a person holding a license, certificate or permit under Chapter 5 of Division 2 of the code if to a substantial degree it evidences present or potential unfitness of a person holding a license, certificate or permit to perform the functions authorized by the license, certificate or permit in a manner consistent with the public health, safety or welfare. Such crimes or acts shall include but not be limited to the following: Violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate any provision or term of Chapter 5, Division 2 of the code."

division 2 is concerned, we need only mention—just by way of example —that subdivision (e) of section 2361 lists as unprofessional conduct "[t]he commission of any act involving dishonesty or corruption, whether the act is committed in the course of the individual's activities as a certificate holder, or otherwise, or whether the act is a felony or a misdemeanor."

Second, respondent claims that the Board was misled into using the superseded criteria set forth in section 1355 which, as noted, (see fn. 11, *ante*) contained as subdivision (b) "[c]onviction of a crime involving fiscal dishonesty." In fact the superior court specifically found that the Board was so misled.[13] Concededly, the deputy attorney general supporting the accusation had cited the Board to the superseded section, but we find no justification whatever for assuming that the Board was unaware of its own action in rewriting the section. Nothing in the three-page order of December 19, 1977, even hints that the Board was misled by counsel's out-of-date reference.

■ Respondent also claims that the Board failed to consider evidence of Doctor Windham's rehabilitation, although required to do so by statute. This argument, too, has no basis in fact. The Board's order contained many recitals indicating factors from which it could be inferred that the Board felt that respondent was on the way toward rehabilitation. Thus, the Board found that respondent had started to study a new specialty in California when he arrived here in 1972, that he had become Board qualified in that specialty, that he makes many appearances as an expert witness for "both the prosecution and various defense counsel" in criminal matters, that he has spoken at various criminal law training sessions and seminars and that, according to his probation officer, he has complied with all of the terms of the probation, including all payments directed to be made. What respondent is really complaining about is that the Board did not find that he was 100 percent rehabilitated.

■ Allied to this last argument is respondent's contention that he had become totally rehabilitated as a matter of law—as indeed the trial court had found—and that the imposition of discipline of any kind was therefore improper.

---

[13]Its conclusion of law 15 read: "The Decision and Order of the Board was substantially affected by its erroneous reliance upon a repealed version of section 1360 of title 16 of the California Administrative Code."

This argument rests on several erroneous assumptions, both legal and factual. While, as noted, the trial court must exercise its own independent judgment in determining whether the findings which would justify discipline in the first place are supported by the weight of the evidence, the propriety of the penalty to be imposed—in the light of rehabilitation and other relevant factors—is vested in the discretion of the Board, subject only to "manifest abuse." (*Cadilla* v. *Board of Medical Examiners* (1972) 26 Cal.App.3d 961, 968 [103 Cal.Rptr. 455].) The trial court evidently failed to draw that distinction or, perhaps, it erroneously felt that a finding of complete rehabilitation was compelled. Indisputably, that was not the case. The fact that a professional who has been found guilty of two serious felonies rigorously complies with the conditions of his probation does not necessarily prove anything but good sense. Nor did the court have to accept respondent's own protestations of rehabilitation. The trial court therefore exceeded its powers when it found that "Dr. Windham had become totally rehabilitated since his conviction of income tax evasion...."

■ Finally, relying on *Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 87-88 [17 Cal.Rptr. 488, 366 P.2d 816], respondent argues that the discipline imposed was too severe. In particular he attacks a provision that he "donate his professional services free of charge to a community health institution or agency for at least 20 hours a month on a regular basis for a period of two years...." Frankly we can find nothing wrong with an order which, apart from disciplining the licensee, benefits the public as well. As respondent points out, the object of these disciplinary proceedings is not to punish him again for income tax evasion.[14] It is, rather, "to protect the life, health and welfare of the people at large and to set up a plan whereby those who practice medicine will have the qualifications which will prevent, as far as possible, the evils which could result from...a lack of honesty and integrity." (*Furnish* v. *Board of Medical Examiners* (1957) 149 Cal.App.2d 326, 331 [308 P.2d 924, 309 P.2d 493].) In short, the purpose of discipline is to make the respondent a better physician. Charity has always been one of the attributes of a good doctor. In the ancient Hippocratic Oath the physician promises: "With purity and with holiness I will pass my life and practice my art...." More specifically, in modern version, the 1948 Declaration of Geneva, the doctor pledges to "consecrate [his] life to the service of humanity." Clearly, the charitable work respondent is

---

[14]Analogies to impermissible conditions of probation in the criminal context (see e.g., *People* v. *Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545]) are, therefore, of limited help.

to do as a condition of probation is right in line with the purpose of the proceedings below.

■ Lastly, there is a matter which arose at oral argument when counsel for respondent said this of his client: "He never withheld any information, he never concealed it—they just waited and then they brought it . . ." meaning, of course, the disciplinary proceeding which was not started for several years after the federal conviction had become final. Although we were somewhat startled by the relevancy of that argument since we had not been aware that any defense relating to the Board's tardiness in starting the proceedings against respondent had ever been raised, it certainly suggested that in spite of full knowledge of all the circumstances, somebody in California did a very slow burn before proceeding. We requested additional briefing.

To make a long story short, it then became clear that there really had never been an occasion for respondent to withhold any information from the Board when he was admitted to practice in California, because at that time he had not yet been indicted in Mississippi. Nor does the record show that there was any later occasion when respondent had an opportunity to "conceal" his indictment or the subsequent conviction. Just how and when these matters ever came to the attention of the Board was and remains a mystery.

In any event, quite apart from the fact that the notice of defense never referred to the lateness of the accusation, the entire matter is a red herring. Although respondent now speaks of laches, no evidence in support of any such theory was ever offered. There is, of course, no applicable statute of limitations as such.

The judgment of the superior court must, therefore, be reversed. The only error committed by the Board has already been adverted to: its order of January 19, 1978, failed to provide that in the event respondent complied with the terms and conditions of the probation, the revocation of his license was to be permanently stayed. The Board is, by this opinion, ordered to make the necessary correction.

The judgment is reversed.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied April 23, 1980, and respondent's petition for a hearing by the Supreme Court was denied June 4, 1980. Newman, J., was of the opinion that the petition should be granted.