[No. C007162. Third Dist. Jan. 24, 1991.]

LAWRENCE H. FOSTER, JR., Plaintiff and Appellant, v. BOARD OF MEDICAL QUALITY ASSURANCE, Defendant and Respondent.

COUNSEL

Peter Desler and Julie A. Garfield for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Joel S. Primes, Deputy Attorney General, for Defendant and Respondent.

OPINION

**CARR, Acting P. J.**—Lawrence H. Foster, Jr., M.D. (Dr. Foster), filed a petition for writ of mandate (Code Civ. Proc., § 1094.5) in the Superior Court of El Dorado County on March 28, 1988. The petition sought a writ

to compel the Board of Medical Quality Assurance (BMQA) to set aside its decision to suspend his medical license for 90 days for unprofessional conduct. (Bus. & Prof. Code, §§ 2234, 2261.)[1] The matter was transferred to Sacramento County.

The trial court declined to issue the writ, finding that the BMQA decision was properly reached and supported by the evidence. Dr. Foster timely appeals, contending his actions do not fall within the conduct proscribed by statute, and that the statutes are unconstitutionally vague as applied. We shall affirm.

## STANDARD OF REVIEW

██ While the trial court was obliged to exercise its independent judgment, we apply the normal standard of appellate review upon its factual findings. Thus, we look to see if the trial court's decision is supported by substantial evidence. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20].) We independently review questions of law.

## FACTS

On July 1, 1982, Barton Memorial Hospital adopted a bylaw, effective August 31, 1982, requiring members of its staff to maintain medical malpractice insurance in a specified amount.[2] Dr. Foster had voted against the bylaw. Dr. Foster created his own insurance policy in a nonexistent insurance company and signed a verification form stating it was valid.[3] The coverage in this bogus insurance company was $500,000 per incident and aggregate coverage of $1.5 million, the amount required by Barton Memorial Hospital: Dr. Foster's staff privileges were continued. In 1984 he signed another verification form and again his privileges were continued. In aid of

---

[1] The suspension was stayed, initially in the trial court and then by this court, pending exhaustion of Dr. Foster's right to judicial review.

Section references are to the Business and Professions Code.

[2] Health and Safety Code section 1319 permits a hospital to require members of its staff to obtain liability insurance.

[3] Several companies had denied Dr. Foster's request for malpractice insurance. The record contains a photocopy of a published decision, *Stone* v. *Foster* (1980) 106 Cal.App.3d 334 [164 Cal.Rptr. 901], a successful appeal by Dr. Foster from a large verdict in a malpractice case against him.

The policy as composed by Dr. Foster is for a one-year period and provides coverage only where the negligence occurs while it was in force, and a final "judgement[] [*sic*] from the state Supreme Court level" is tendered "while the policy is still in force." We find rather whimsical the notion that an act of negligence and a final Supreme Court judgment ensuing therefrom could occur in one year.

this scheme he had opened a bank account in Monte Carlo and created a "paper" company in Hong Kong. He falsified, or had others falsify, several letters in response to attempts to verify the existence of the insurance company or the policy. He provided the hospital with copies of cancelled checks allegedly given to pay premiums on the nonexistent insurance policy and which had been tampered with. He failed to provide the originals or give the hospital access to his records. In September 1984, he resigned from the hospital effective August 1, 1984. A letter was sent to an investigator from the Department of Insurance by a representative of Dr. Foster. In the letter it was claimed that there was a fund for a group of doctors who wished to self-insure and the writer was the manager of this self-insurance fund.

BMQA found this course of conduct constituted a violation of sections 2234 and 2261, in that Dr. Foster committed unprofessional conduct by committing an act of dishonesty related to his duties as a physician and in making or signing documents related to the practice of medicine which falsely state facts.[4]

Dr. Foster "engaged in a lengthy and complicated effort to mislead Barton and the California Department of Insurance by subterfuge and falsehood including, but not limited to, his mail drop, misleading letters, representation that his firm consisted of a group of physicians, and his refusal to provide information to the California Department of Insurance and Barton's executive committee." The writ was denied and this appeal followed.

## DISCUSSION

Dr. Foster grossly mischaracterizes the nature of the case in his effort to overturn the modest discipline imposed for his conduct. He maintains he was punished because of a business dispute between himself and Barton Memorial Hospital over his compliance, *vel non*, with the bylaw requiring malpractice insurance. He characterizes his conduct as a mere "failure of a physician to satisfy a hospital bylaw," but as the facts show, he engaged in a pattern of dishonesty in a conscious attempt to evade the bylaw; he did not merely fail to comply with it.

---

[4] Section 2234 provides in part: "[U]nprofessional conduct includes, but is not limited to, the following: [¶] . . . (e) The commission of any act involving dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon."

Section 2261 provides: "Knowingly making or signing any certificate or other document directly or indirectly related to the practice of medicine or podiatry which falsely represents the existence or nonexistence of a state of facts, constitutes unprofessional conduct."

Dr. Foster's briefs are filled with several minor chords, which we will address in order.

■ First, he contends his conduct does not fall within either section 2234 or section 2261. We disagree. Section 2234 proscribes "The commission of any act involving dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon." Section 2261 provides: "Knowingly making or signing any . . . document directly or indirectly related to the practice of medicine . . . which falsely represents the existence or nonexistence of a state of facts, constitutes unprofessional conduct." He contends the falsification of insurance coverage is not "substantially related" to the duties of a surgeon or "indirectly related to the practice of medicine." However, intentional dishonesty of the sort displayed here demonstrates a fundamental lack of moral character which is incompatible with the honesty required to properly maintain the doctor-patient relationship. (*Windham* v. *Board of Medical Quality Assurance* (1980) 104 Cal.App.3d 461, 470 [163 Cal.Rptr. 566]; *Matanky* v. *Board of Medical Examiners* (1978) 79 Cal.App.3d 293, 305 [144 Cal.Rptr. 826].) While the documents Dr. Foster falsified were not patient records or Medi-Cal claim forms, as in several of the cases on which he relies, they were "indirectly related" to his medical practice. This is so because, had he not falsified the documents, he would not have been operating on patients at the hospital while "flying bare" (i.e., going without insurance). His patients would have had protection against his possible negligence by virtue of his insurance, or they would have sought the services of another physician.

Dr. Foster contends he cannot be disciplined because his actions did not threaten patient welfare. He cites various distinguishable cases wherein physicians were disciplined for more serious misconduct which directly threatened the public.[5] However, his actions in this case posed such a threat, in that he deprived his patients of a potential remedy for any of his medical misdeeds. The board need not wait until malpractice is alleged.[6] In *Wilkinson* v. *Madera Community Hospital* (1983) 144 Cal.App.3d 436 [192 Cal.Rptr. 593], a physician sued a hospital which denied him privileges for his failure to maintain malpractice insurance with a recognized insurance company as required by the bylaws. The court noted that a policy of insur-

---

[5] He also cites several cases involving arrests or convictions of doctors. A conviction is required for discipline under section 2236 (former section 2383), but is not required under sections 2234 or 2261.

[6] It does not matter that the board did not show any particular patient was misled as to coverage. The essence of the doctor-patient relationship is that patients will trust doctors and hospitals to protect them from harm, iatrogenic or otherwise. Here the hospital sought to protect its patients as well as itself, and Dr. Foster frustrated that noble purpose.

ance with a properly recognized carrier "would be more likely to furnish secure financial protection to the Hospital, *to the Hospital's patients,* and to the insured himself." (*Id.* at p. 441, italics added. See also *id.* at p. 443.) The lack of insurance indirectly threatened Dr. Foster's patients.

Dr. Foster cites former Justice Kaus's dissenting opinion in *McLaughlin v. Board of Medical Examiners* (1973) 35 Cal.App.3d 1010 [111 Cal.Rptr. 353] in support of his contention that his misconduct did not relate to his professional duties. The doctor in that case committed a public homosexual act, which former Justice Kaus believed was not related to the doctor's professional abilities. (*Id.* at pp. 1018-1020.) The dissent in that case is not helpful to Dr. Foster, for his misconduct was, as we have just stated, related to his professional activities, and at least indirectly threatened his patients.[7] Particularly troubling is Dr. Foster's characterization of his conduct as an "isolated act of noncompliance." This indicates he does not accept that his conduct demonstrated prolonged dishonesty, utterly incompatible with his duties as a physician to maintain honesty with his patients.[8]

Dr. Foster contends that once the hospital notified him of his noncompliance he resigned, thus there is no evidence that the public was harmed or threatened. This statement misrepresents the facts, specifically the fact that by use of his phony policies Dr. Foster continued practicing at the hospital for nearly two years after the bylaw became effective.

Finally, Dr. Foster contends the statutes under which he has been disciplined are void for vagueness "as applied." His argument is that "it is unreasonable to charge [him] with advance knowledge that BPC §§ 2234 or 2261 might be construed by BMQA and/or the Courts to penalize him because he failed to satisfy the Barton Hospital Bylaw regarding insurance." This argument rests on the notion, discredited above, that he was penalized for a "business dispute" with the hospital. In fact, as the record reflects, BMQA properly disciplined Dr. Foster in order to protect the public from further dishonesty. The statutes, as applied in this case, are not "vague." (*Fort* v. *Board of Medical Quality Assurance* (1982) 136 Cal.App.3d 12, 23-24 [185 Cal.Rptr. 836].)

---

[7] Dr. Foster should be aware of former Justice Kaus's comments in *Windham* v. *Board of Medical Quality Assurance* (1980) 104 Cal.App.3d 461, at page 470 [163 Cal.Rptr. 566]: "[W]e find it difficult to compartmentalize dishonesty in such a way that a person who is willing to cheat [on his taxes] may yet be considered honest in his dealings with his patients."

[8] The Hippocratic Oath provides in part: "All that may come to my knowledge in the exercise of my profession or outside of my profession or in daily commerce with men, which ought not to be spread abroad, I will keep secret and will never reveal. If I keep this oath faithfully, may I enjoy my life and practice my art, respected by all men and in all times; but if I swerve from it or violate it, may the reverse be my lot." (Stedman's Med. Dict. (5th ed. 1982) p. 650.) Such a solemn oath requires the highest degree of honesty, a trait Dr. Foster demonstrably lacks. (See *Windham* v. *Board of Medical Quality Assurance, supra,* 104 Cal.App.3d at p. 470.)

## DISPOSITION

The judgment is affirmed.

Davis, J., and Scotland, J., concurred.