[No. 57521-5. En Banc. November 7, 1991.]

THEODORE R. HALEY, *Appellant*, v. THE MEDICAL
DISCIPLINARY BOARD, *Respondent*.

*Mary Ann Ottinger; Joel D. Cunningham, Bonnie Bake-
man Harrison,* and *Williams, Kastner & Gibbs,* for appel-
lant.

*Kenneth O. Eikenberry, Attorney General,* and *Joyce A.
Roper, Assistant,* for respondent.

GUY, J. — The Washington State Medical Disciplinary
Board imposed sanctions against Dr. Theodore Haley after
ruling that his sexual relationship with a former teenage
patient constituted unprofessional conduct. Dr. Haley
appeals the Board's decision. We affirm the Board.

## FACTS

M.[1] was involved in an automobile accident that
required the emergency removal of her spleen on May 24,
1986, 2 days before her 16th birthday. The surgeon per-

---

[1]To preserve the privacy of Dr. Haley's former patient, we shall use initials to
refer to her.

forming the splenectomy was Dr. Theodore Haley, a 66-year-old general surgeon and former state legislator then practicing medicine in Tacoma. Dr. Haley was the surgeon on duty for emergencies at the hospital where M. was taken following the accident; he had no prior contact with her. After the surgery, Dr. Haley provided brief follow-up care for M. The last postoperative visit was on June 10, 1986. On December 1, 1986, M. contacted Dr. Haley to discuss the scar resulting from the surgery. Dr. Haley advised her to see a plastic surgeon and told her that she need not see him again because there was no need for further treatment.

Early in March 1987, M., accompanied by a friend, stopped by Dr. Haley's office for a brief social visit "on an impulse to see the doctor that had operated on her." One of the nurses in Dr. Haley's office testified that, whereas on previous visits M. had "looked like a teenage patient", on this occasion she "looked like a beautiful sophisticated woman". About a week later, M. returned for a second visit. Dr. Haley gave her three glasses of wine and then kissed her on the cheek after walking her to her car. She returned again in another week, and this time, by Dr. Haley's account, they engaged in kissing, hugging, and sexual foreplay in a room used to receive patients. Dr. Haley gave her his beeper number and asked her to call him. She did so a week later, and shortly thereafter — at the end of March or early April — they began a sexual relationship.

In March 1987, M.'s parents received an anonymous phone call informing them of an inappropriate social relationship between M. and Dr. Haley. M.'s parents dismissed the call out-of-hand. They knew of Dr. Haley only as the respected surgeon who had operated on M.

M.'s parents learned of Dr. Haley's relationship with their daughter in the early morning hours of April 6, 1987. At about 3 a.m., they discovered that M. was not in her room and not in the house. Assuming his daughter would be returning home soon, M.'s father parked his car across the street and waited. After about an hour, a pickup truck

pulled in front of the house, and M. got out and went inside. According to M.'s father, he pulled his car in front of the truck, which then sped away, and he gave chase. M.'s father testified that he chased the truck for 10 or 15 minutes through predominantly residential areas at speeds of 40 to 60 miles per hour, and then followed it into a parking lot where it came to a stop. M.'s father stated that he was "flabbergasted" when Dr. Haley stepped out of the truck. He also said that Dr. Haley suggested they sit down and have a cup of coffee together, an offer he declined. After a short confrontation, M.'s father drove away.

Dr. Haley's recollections differ as to what occurred after he drove away from M.'s parents' house. Dr. Haley denied trying to evade M.'s father, and testified that after he dropped M. off and pulled away, he noticed someone following him. Reasoning that it was M.'s father and that he was probably upset, Dr. Haley stated that he drove until he found an all-night restaurant where they could sit down and talk. His memory of the ensuing encounter in the parking lot agrees with M.'s father's.

A couple of days later, M.'s father telephoned Dr. Haley at his office. M.'s father told Dr. Haley that he would forget the whole affair if Dr. Haley would have no further contact with M. According to M.'s father, Dr. Haley agreed. However, Dr. Haley later unsuccessfully requested of M.'s mother permission to see M. Despite the opposition of M.'s parents, Dr. Haley and M. continued to see one another in secret. They agreed to disregard the wishes of M.'s parents. M. found it necessary to lie to her parents in order to carry on the relationship.

During the course of their relationship, Dr. Haley and M. went out to dinner two or three times per week. Dr. Haley often furnished M. with alcohol and frequently engaged in sexual intercourse with her. M. has stated that alcohol was always available when she was with Dr. Haley, and that she generally drank to mild intoxication. Prior to the time when M. became involved with Dr. Haley, her

consumption of alcohol was not excessive. A clinical psychologist who counseled M. subsequent to her affair with Dr. Haley testified that she is now an alcoholic.

M. had experienced some difficulty with high school work in the fall of 1986, and this worsened as the school year progressed. The difficulties were exacerbated in the spring of 1987 by her relationship with Dr. Haley. She eventually dropped out of school. Her parents lost all but nominal control over her, and she eventually moved out of the family home. According to M., the reason she moved out was that her parents told her she could not see Dr. Haley while she was living at home. M. lived with friends for a while; then, during the summer of 1987, she moved into a beach house to which Dr. Haley had access. According to M., she lived there for about 2 months. Dr. Haley says it was only 2 weeks. During this time, Dr. Haley kept the beach house stocked with alcohol, replenishing the supply as the alcohol was consumed. Dr. Haley provided M. with a car and gave her money ($10 to $20 per day), which was understood to be in exchange for her house sitting.

In the fall of 1987, M. was living at home again and was back in school. Dr. Haley continued his sexual relationship with her. M. testified, "I was still seeing him. I remember it was hard on me because we would go out on weeknights and I would just be dragging the next day. And never ever — I couldn't get my homework done. I was too tired all the time." The relationship between Dr. Haley and M. degenerated until, in M.'s words, "[i]t just seemed like we were just drinking and having sex". Their sexual relationship ended in February or March of 1988.

M.'s parents filed a complaint against Dr. Haley with the Washington State Medical Disciplinary Board. After a preliminary investigation, the Board conducted 3 days of hearings to evaluate the charges of unprofessional conduct. On September 15, 1989, the Board announced its decision. The Board found that Dr. Haley's relationship with M. "constituted the exploitation of a juvenile for sexual gratifi-

cation. [Dr. Haley] exploited his position of psychological power and authority over [M.] in order to facilitate their improper sexual relationship." The Board also found that "[b]oth [M.] and her parents suffered emotionally as individuals and as a family unit as the result of [Dr. Haley's] continuing his sexual relationship with [M.]." The Board concluded that Dr. Haley's relationship with M. constituted unprofessional conduct under RCW 18.130.180. The Board suspended Dr. Haley's medical license for 10 years, but stayed the suspension subject to specified conditions of probation. Those conditions were later eased in an amended order under which Dr. Haley may practice medicine anywhere he chooses, subject to the Board's approval. He is required to serve a 10-year period of probation during which his professional practice is to be monitored, and he must receive monthly psychiatric evaluations and submit periodic declarations of compliance with the terms of his probation.

In response to the Board's decision, Dr. Haley filed a petition for judicial review of the Board's decision in Thurston County Superior Court. The trial judge certified the case to the Court of Appeals, which then certified the case to this court. We accepted certification and now affirm the Board.

ISSUE

The Board ruled that Dr. Haley's conduct in relation to M. constituted unprofessional conduct as defined by RCW 18.130.180(1) and (24), which provide:

> The following conduct, acts, or conditions constitute unprofessional conduct for any license holder or applicant under the jurisdiction of this chapter:
> (1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not. . . .
> . . . .
> (24) Abuse of a client or patient or sexual contact with a client or patient[.]

In this appeal, Dr. Haley has not assigned error to any of the Board's findings of fact. His sole contention is that the Board erroneously interpreted the law in ruling that he had committed unprofessional conduct under RCW 18.130.180(1) and (24).

We agree with the Board that Dr. Haley's conduct constituted moral turpitude, dishonesty, or corruption relating to the practice of his profession, in violation of RCW 18.130.180(1). We disagree, however, with the Board's application of RCW 18.130.180(24).

ANALYSIS

I

Background

■ The Legislature enacted the Medical Disciplinary Board Act (Act), the statute creating the Board, in 1955. RCW 18.72. The Act was passed in the exercise of the State's police power to promote the public welfare and to create an administrative agency mandated to act as a disciplinary body for medical professionals. RCW 18.72-.010(1). The Act also provides that it was passed because of the paramount importance of the health and well-being of Washington citizens, the role of medical professionals in preserving this health and well-being, and the ineffectiveness of the disciplinary agency that had existed previously. RCW 18.72.010(2)-(4). We interpret the stated purposes of the Act as giving the Board a legislative mandate to pursue vigorously its disciplinary task.

Upon receiving a nonfrivolous complaint regarding a licensee under its jurisdiction, the Board conducts a preliminary investigation to determine whether there has been unprofessional conduct. RCW 18.130.080. If the Board determines there is reason to believe that there has been unprofessional conduct, the Board serves a statement of charges upon the physician, who then may request a hearing. RCW 18.130.090. If such a hearing results in a finding of unprofessional conduct, the Board may take

various actions, including suspending or revoking the physician's license, imposing restrictions on the physician's right to practice, requiring monitoring of the physician's practice, and compliance with conditions of probation. RCW 18.130.160.

Because the Board is an administrative agency, judicial review of the Board's decisions is limited by the Administrative Procedure Act, RCW 34.05; or, if the hearing was begun before July 1, 1989, as was the case here, by the former act, RCW 34.04. RCW 34.05.902. In reviewing an administrative agency's conclusions of law, we apply the "error of law" standard of former RCW 34.04.130(6)(d). Under this standard, we accord substantial weight to the agency's interpretation of the law, although we may substitute our judgment for that of the agency. *St. Francis Extended Health Care v. Department of Social & Health Servs.*, 115 Wn.2d 690, 695, 801 P.2d 212 (1990). An agency's findings of fact are reviewed under the "clearly erroneous" standard of former RCW 34.04.130(6)(e). *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983). Uncontested findings of fact are deemed verities on appeal. *St. Francis Extended Health Care*, at 692.

## II
### Patient Relationship

The Board concluded that Dr. Haley's sexual contact with M. "occurred under such proximity to her relationship with him as her physician and surgeon that his sexual conduct with her constitutes a violation of RCW 18.130-.180(24) as sexual contact with a patient." Because the facts do not establish that M. was Dr. Haley's patient during the time of their sexual contact, we disagree with the Board's application of RCW 18.130.180(24).

The statute defines unprofessional conduct to include "sexual contact with a client or patient". This language

prohibits a physician from having sexual contact with a current patient. It does not prohibit a physician from having sexual contact with a former patient. In the present case, the facts do not support the conclusion that M. was Dr. Haley's patient during the time of their sexual contact.

Dr. Haley performed an emergency splenectomy on M. at the end of May 1986. His medical relationship with her was limited to performing that surgery and then providing postoperative care; there is no indication of any improprieties during this period. The Board stated that the contact between Dr. Haley and M. "during the course of treatment and follow-up was professional and there is no evidence of any attempt to improperly influence [M.]". Furthermore, although exactly when the doctor-patient relationship between Dr. Haley and M. ended is unclear, it concluded before their sexual relationship began. Various experts testified regarding this point, one saying the doctor-patient relationship ceased on June 10, 1986 (the last postoperative visit after the splenectomy), another saying August 22, 1986 (90 days after the splenectomy), and a third saying December 1, 1986 (when M. saw Dr. Haley about her scar). Although these experts disagreed as to the exact date, however, all of them agreed that the medical relationship ended no later than December 1, 1986, and there are no facts that suggest otherwise. Yet the sexual relationship was not initiated until M. visited Dr. Haley at his office in March 1987. In short, there were no improprieties during the course of Dr. Haley's treatment or follow-up care for M., and the facts indicate that M. was not Dr. Haley's patient during the time of the sexual relationship. Therefore, there is no basis for saying that Dr. Haley had sexual contact with a patient, in violation of RCW 18.130.180(24).

We recognize that the sexual relationship occurred in close proximity to the doctor-patient relationship. But proximity is not enough. In order to find a violation of

RCW 18.130.180(24), the Board must be prepared to make the factual finding that the doctor-patient relationship actually existed at the time of the sexual contact. No such finding was made here. Had such a finding been made, we would accept it unless it were clearly erroneous; that is, unless review of the entire record left us with the definite and firm conviction that a mistake had been made. *See Franklin Cy.*, at 324 (an agency's findings of fact may be overturned only if clearly erroneous). In the absence of such a finding, however, we must decide de novo whether the specific facts of the case support the conclusion that a violation of RCW 18.130.180(24) occurred. *See Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984) (judicial review of agency conclusions of law is de novo). Here, Dr. Haley was a surgeon whose medical relationship was limited to performing an emergency surgery and then providing brief follow-up care. The restricted nature of Dr. Haley's medical relationship with M. does not, in our view, support the conclusion that the doctor-patient relationship continued to exist later during the time of their sexual contact, and therefore does not sustain the inference that Dr. Haley violated RCW 18.130.180(24). However, were Dr. Haley a family physician, a psychiatrist, an internist, an oncologist, or almost any other type of physician who typically has an ongoing relationship with patients, we would conclude — under facts otherwise similar to those before us — that the physician had engaged in sexual contact with a patient.

We also recognize that psychological aspects of the doctor-patient relationship may continue to exist after medical treatment has ended, and that M. was probably influenced psychologically by Dr. Haley's status as her former surgeon. Indeed, we regard these facts as highly relevant to the conclusion, with which we agree, that Dr. Haley abused his professional status in violation of RCW 18.130.180(1). Nonetheless, RCW 18.130.180(24) does not

proscribe sexual contact between doctors and their former patients, however much those former patients may have been influenced psychologically by the terminated doctor-patient relationship. It proscribes sexual contact between doctors and their current patients. The facts of this case do not establish that Dr. Haley had sexual contact with M. during the time she was his patient. Therefore, RCW 18.130.180(24) does not apply.

### III
### Conduct Indicating Unfitness To Practice Medicine

The Board concluded that Dr. Haley's extended sexual conduct with M. constituted unprofessional conduct under RCW 18.130.180(1). We agree.

■■ RCW 18.130.180(1) provides that for any person under the jurisdiction of the uniform disciplinary act, RCW 18.130, "[t]he commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession" constitutes unprofessional conduct. The principal question that arises in applying this statute concerns the relationship between the practice of the profession and the conduct alleged to be unprofessional. To serve as grounds for professional discipline under RCW 18.130.180(1), conduct must be "related to" the practice of the profession. We construe the "related to" requirement as meaning that the conduct must indicate unfitness to bear the responsibilities of, and to enjoy the privileges of, the profession.

*In re Kindschi*, 52 Wn.2d 8, 319 P.2d 824 (1958) illuminates the nature of this requirement. There, the Board had suspended a physician's license to practice medicine after he was convicted of tax fraud. The tax fraud was not related to the physician's diagnosis, care, or treatment of any patient. We nonetheless upheld the Board, and in doing so we took a broad view of the required relationship between the improper conduct and the

practice of the profession. A medical disciplinary proceeding, we explained, is taken for two purposes: to protect the public, and to protect the standing of the medical profession in the eyes of the public. *In re Kindschi, supra* at 11; *cf. In re McGrath*, 98 Wn.2d 337, 345, 655 P.2d 232 (1982) (identifying similar purposes in regard to disciplining attorneys). We stated that the due process and equal protection clauses of the United States Constitution apply to disciplinary proceedings, and that no person may be prevented from practicing a profession except for valid reasons. *In re Kindschi, supra* at 11-12 (citing *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957)). Conviction for tax fraud, we explained, is a valid reason to take disciplinary action against a physician:

> The public has a right to expect the highest degree of trustworthiness of the members of the medical profession. We believe there is a rational connection between income tax fraud and one's fitness of character or trustworthiness to practice medicine, so that the legislature can properly make fraudulent conduct in such instances a ground for revoking or suspending the license of a doctor.

*In re Kindschi, supra* at 12. Being convicted of tax fraud does not indicate any lack of competence in the technical skills needed to be a physician. Rather, it indicates a lack of the high degree of trustworthiness the public is entitled to expect from a physician. It raises a reasonable apprehension that the physician might abuse the trust inherent in professional status, and it diminishes the profession's standing in the public's eyes. Trust is essential to ensure treatment will be accepted and advice followed.

We reached a similar holding in *Standow v. Spokane*, 88 Wn.2d 624, 564 P.2d 1145, *appeal dismissed*, 434 U.S. 992 (1977). The Spokane City Council had denied a taxicab license to Standow because of his convictions for larceny and burglary. The basis for the City Council's action was RCW 9.96A.020, which provides that a felony conviction may be the basis for license disciplinary action if the felony

"directly relates to" the occupation for which the license is held. This court upheld the City Council's decision, declaring that "the nature of this occupation places the general public in a particularly vulnerable position should a licensee fail to discharge his occupation with a sense of justice and honesty." 88 Wn.2d at 638.

*In re Kindschi, supra,* and *Standow* demonstrate that conduct may indicate unfitness to practice a profession or occupation without being directly related to the specific skills needed for that practice. The conduct need not have occurred during the actual exercise of professional or occupational skills, nor need the conduct raise general doubts about the individual's grasp of those skills. In the context of medical disciplinary proceedings, and in the light of the purposes of such proceedings, conduct may indicate unfitness to practice medicine if it raises reasonable concerns that the individual may abuse the status of being a physician in such a way as to harm members of the public, or if it lowers the standing of the medical profession in the public's eyes.

■ It should be emphasized that the concerns with protecting the integrity of the profession and protecting the public are not unrelated. Indeed, constitutional constraints mandate that any state-imposed requirement for practicing a profession must be rationally related to a legitimate state interest. *See Schware,* 353 U.S. at 239 (any state qualification for bar admission must "have a rational connection with the applicant's fitness or capacity to practice law"); *Lupert v. California State Bar,* 761 F.2d 1325, 1327-28 (9th Cir.) (upholding bar admission restriction upon showing of rational relationship to legitimate state purpose), *appeal dismissed,* 474 U.S. 916 (1985). The concern with protecting the medical profession, if viewed as a concern with preserving the interests of physicians themselves, is difficult to regard as a legitimate state interest or as rationally related to fitness to practice medicine. *Cf.* Rhode, *Moral Character as a Professional Credential,* 94

Yale L.J. 491, 512 (1985) (concern with protecting the bar's interests is not "the kind of legitimate state interest normally required to restrain vocational choice"). As an interest of the State, however, preserving professionalism is not an end in itself. Rather, it is an instrumental end pursued in order to serve the State's legitimate interest in promoting and protecting the public welfare. To perform their professional duties effectively, physicians must enjoy the trust and confidence of their patients. Conduct that lowers the public's esteem for physicians erodes that trust and confidence, and so undermines a necessary condition for the profession's execution of its vital role in preserving public health through medical treatment and advice.

Other jurisdictions also adhere to the principle that conduct may subject a physician to professional discipline without that conduct being narrowly related to the technical competence needed to practice medicine. For example, in *Windham v. Board of Med. Quality Assur.*, 104 Cal. App. 3d 461, 163 Cal. Rptr. 566 (1980), a physician argued that his conviction for tax evasion was not the type of transgression that reflected on his professional qualifications, functions, or duties. The California Court of Appeals rejected this contention, holding that a conviction for tax evasion necessarily involves moral turpitude and is sufficiently related to the practice of medicine as to justify revocation of a physician's right to practice medicine. *Windham*, at 469-72. The court stated that it is difficult "to compartmentalize dishonesty in such a way that a person who is willing to cheat his government out of $65,000 in taxes may yet be considered honest in his dealings with his patients." *Windham*, at 470.

Similarly, in *Erdman v. Board of Regents of Univ. of N.Y.*, 24 A.D.2d 698, 261 N.Y.S.2d 634 (1965), a physician's license to practice was revoked after he had been convicted of conspiring to influence a judge improperly. The physician argued that his conviction was unrelated to his practice of medicine. The court disagreed, approving the

disciplinary board's findings that the physician's crime evidenced a lack of the degree of integrity the public is entitled to expect from physicians, and that his crime reflected unfavorably on the medical profession. 24 A.D.2d at 699.

*Windham* and *Erdman* are consistent with *In re Kindschi, supra,* and *Standow,* and illustrate the majority rule that

> disciplinary action may be taken against a medical or dental practitioner because of acts or offenses which are not directly connected with his technical competence to practice but which only evidence weaknesses of character which are regarded by the licensing authorities and the courts as inconsistent with the general standards of the profession[.]

Annot., *Physician's or Other Healer's Conduct, or Conviction of Offense, Not Directly Related to Medical Practice, as Ground for Disciplinary Action,* 34 A.L.R.4th 609, 613 (1984).

■ Applying the above principles to the present case, we have little difficulty in concluding that Dr. Haley's conduct constituted unprofessional conduct under RCW 18.130.180(1). In its uncontested findings of fact, the Board found that Dr. Haley's relationship with M. "constituted the exploitation of a juvenile for sexual gratification. [Dr. Haley] exploited his position of psychological power and authority over [M.] in order to facilitate their improper sexual relationship." Dr. Haley exercised psychological power and authority over M. solely by virtue of the relationship he had established with her when he was her surgeon. The Board's uncontested finding of fact is therefore tantamount to the statement that Dr. Haley used his professional status and position to achieve the sexual exploitation of a minor.

Specific facts about the initiation of the sexual relationship independently support this view. The Board found that the first time M. stopped by Dr. Haley's office, in early March 1987, she did so "on an impulse to see the doctor that had operated on her." The second time she visited him, again at his office, Dr. Haley gave her wine and

kissed her. The third time she visited him there, they engaged in sexual foreplay in a room used to receive patients. These facts indicate that Dr. Haley's status as a physician served as the basis for the initiation of the sexual relationship; that Dr. Haley used the trust and confidence he had achieved when serving as M.'s surgeon in order to establish a relationship of sexual exploitation. Such conduct raises reasonable concerns about the need to protect the public, and therefore is a proper subject for sanction by the Board.

Dr. Haley's conduct also indicates unfitness to practice because it casts disrepute on the medical profession in the eyes of the public. The public expects a physician to decline the flirtations of a confused adolescent, not take them as an opportunity for sexual exploitation. As the Board concluded, "[p]arents should be free to entrust their children to a surgeon's care without concern that the surgeon will enter into a sexual relationship with that child at the precise moment that it could be considered the physician-patient relationship has terminated."

In sum, Dr. Haley's conduct indicates unfitness to practice medicine in two ways: it raises concerns about his propensity to abuse his professional position, and it tends to harm the standing of the profession in the eyes of the public, which both lead to reasonable apprehension about the public welfare. Therefore, the Board properly concluded that Dr. Haley engaged in acts of unprofessional conduct under RCW 18.130.180(1).

The Board also ruled that Dr. Haley violated RCW 18.130.180(1) insofar as his conduct transgressed various other statutes. The Board concluded: (1) that Dr. Haley committed child abuse, as defined in RCW 26.44.020(12); (2) that he communicated with a minor for immoral purposes, in violation of RCW 9.68A.090; (3) that he furnished alcohol to a minor under circumstances violating both RCW 26.28.080 and RCW 66.44.270; and (4) that he provided an unsupervised residential living arrangement for a minor female, in violation of RCW 74.15.100.

We recognize that, in an appropriate case, the Board's ruling that a physician has violated RCW 18.130.180(1) might be made more secure by determinations that the physician's conduct violated other statutes as well. Such additional determinations are not required, however. Here, the conclusion that Dr. Haley violated RCW 18.130.180(1) is secure without reference to other alleged statutory violations. We therefore do not consider the Board's rulings that Dr. Haley transgressed RCW 26.44.020(12), RCW 9.68A-.090, RCW 26.28.080, RCW 66.44.270, and RCW 74.15.100, even though the rulings might be supportable.

Dr. Haley raises two arguments to support his contention that he did not violate RCW 18.130.180(1). First, he contends that his relationship with M. did not relate to the practice of his profession. Second, he argues that RCW 18.130.180(1) is unconstitutionally vague. We reject both arguments.

Dr. Haley contends that his relationship with M. did not relate to the practice of his profession because she was not his patient during the time of their sexual contact, and because, as the Board found, he exercised no improper influence over her when she was his patient. Any improper conduct in which he may have engaged, Dr. Haley argues, was not related to his practice of medicine because it was not performed during the course of his medical diagnosis, care, or treatment of patients.

In support of his position, Dr. Haley relies on *McDonnell v. Commission on Med. Discipline*, 301 Md. 426, 483 A.2d 76 (1984), in which the physician had allegedly made intimidating phone calls to two witnesses in a malpractice case against him. Applying a statute defining unprofessional conduct as "[i]mmoral conduct of a physician in his practice as a physician", *McDonnell*, at 435, the court held the phone calls were not unprofessional conduct because they were not related to his actual practice of medicine. 301 Md. at 437. Dr. Haley also relies on *Atienza v. Taub*, 194 Cal. App. 3d 388, 239 Cal. Rptr. 454 (1987), in which a doctor became sexually involved with his patient, who later

filed a medical malpractice suit against him for professional negligence. The patient alleged a breach of fiduciary duty created by the doctor-patient relationship, as well as a violation of a licensing statute allowing discipline of a physician who engages in sexual acts with a patient when those acts are " 'substantially related to the qualifications, functions, or duties" of a physician. 194 Cal. App. 3d at 394 n.3 (quoting Cal. Bus. & Prof. Code § 726). The California Court of Appeals affirmed the trial court's dismissal, holding that "a physician who induces a patient to enter into sexual relations is liable for professional negligence only if the physician engaged in the sexual conduct on the pretext that it was a necessary part of the treatment for which the patient has sought out the physician." 194 Cal. App. 3d at 393.

We reject Dr. Haley's argument that his conduct was unrelated to the practice of medicine. *In re Kindschi, supra,* and *Standow* demonstrate that conduct need not be narrowly related to the practice of the profession in order for it to indicate an unfitness to practice for purposes of RCW 18.130.180(1). As we explained above, conduct may indicate unfitness to practice the profession either by raising concerns that the individual may use the professional position to harm members of the public, or by tending to lower the standing of the profession in the public's eyes, thereby affecting the quality of public health which is a legitimate public concern. Dr. Haley used the trust and confidence he established, as a surgeon, with a minor child of 16 years to develop a relationship of sexual exploitation, a relationship that harmed both the child and her parents. Such conduct demonstrates unfitness to practice medicine for purposes of RCW 18.130.180(1).

The cases on which Dr. Haley relies are distinguishable. In *McDonnell v. Commission on Med. Discipline, supra,* the Maryland court was applying a statute prohibiting " '[i]mmoral conduct of a physician in his practice as a physician", and the court appropriately stated that "immoral conduct" under this statute "must occur while in the

performance of a physician's practice". 301 Md. at 434. We are applying RCW 18.130.180(1), however, which is broader than the Maryland statute because it prohibits not just immoral conduct in the practice of a physician, but "moral turpitude, dishonesty, or corruption relating to the practice of the person's profession". As we have explained, under this statute, a professional's conduct may indicate unfitness to practice without having occurred during the actual performance of professional practice. *Atienza v. Taub, supra*, is also inapposite. The issue there, unlike the present case, was not whether sexual contact with a patient or former patient warranted disciplinary action but whether such contact could serve as the basis for the patient's action for medical malpractice.

Dr. Haley also argues that RCW 18.130.180(1) is unconstitutionally vague. We disagree.

■ The protections of due process apply to medical disciplinary proceedings. *In re Kindschi*, 52 Wn.2d 8, 11, 319 P.2d 824 (1958). A vague statute offends due process. *In re Curran*, 115 Wn.2d 747, 758, 801 P.2d 962 (1990). Therefore, any statute under which sanctions may be imposed for unprofessional conduct must not be unconstitutionally vague.

■ ■ A statute is presumed to be constitutional. *Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366, 78 A.L.R.4th 1115 (1988); *State v. Maciolek*, 101 Wn.2d 259, 263, 676 P.2d 996 (1984). The party challenging a statute's constitutionality on vagueness grounds has the burden of proving its vagueness beyond a reasonable doubt. *Eze*, at 26; *Maciolek*, at 263.

■ A statute is void for vagueness if it is framed in terms so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application". *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126 (1926); *In re Curran*, at 758. The purpose of the vagueness doctrine is to ensure that citizens receive fair notice as to what conduct is proscribed,

and to prevent the law from being arbitrarily enforced. *Eze*, at 26.

The prohibition against vague laws is not absolute. Some measure of vagueness is inherent in the use of language. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. Rockford*, 408 U.S. 104, 110, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972). Therefore, "a statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct." *Eze*, at 27. "[D]ifficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness." *Jordan v. De George*, 341 U.S. 223, 231, 95 L. Ed. 886, 71 S. Ct. 703 (1951); *In re Curran*, 115 Wn.2d at 758. Moreover, one to whose conduct a statute clearly applies may not challenge it on the grounds that it is vague as applied to the conduct of others. *Parker v. Levy*, 417 U.S. 733, 756, 41 L. Ed. 2d 439, 94 S. Ct. 2547 (1974); *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982).

Dr. Haley asserts that RCW 18.130.180(1) is vague because of its use of the term "moral turpitude". He argues that RCW 18.130.180(1) failed to give him adequate notice of what conduct was prohibited and, more generally, that the statute fails to give adequate standards in order to prevent arbitrary enforcement.

We recognize the uncertainties associated with terms such as "moral turpitude" or "immorality". Not surprisingly, courts have declared void for vagueness statutes that rely on an unrestricted application of the concept of morality. For example, in *Musser v. Utah*, 333 U.S. 95, 96-98, 92 L. Ed. 562, 68 S. Ct. 397 (1948), the Supreme Court stated that a state statute punishing conspiracies "to commit any act injurious . . . to public morals" might be void for vagueness unless limited by the state courts. On remand, the Utah Supreme Court concluded that the statute could not

be limited, and so declared it void. *State v. Musser*, 118 Utah 537, 223 P.2d 193 (1950). Commentators also have criticized the use of terms such as "moral turpitude" in professional discipline or penal statutes. *E.g.*, Rhode, *Moral Character as a Professional Credential*, 94 Yale L.J. 491 (1985) (discussing moral character requirement for bar admissions); Shapiro, *Morals and the Courts: The Reluctant Crusaders*, 45 Minn. L. Rev. 897, 959 (1961) (arguing that the courts "will not, and cannot, manufacture a moral consensus which society has failed to find for itself").

█ Nonetheless, the use of vague terms does not necessarily render a statute as a whole impermissibly vague. In a vagueness challenge, we do not analyze portions of a statute in isolation from the context in which they appear. *State v. Foster*, 91 Wn.2d 466, 474, 589 P.2d 789 (1979). If a statute can be interpreted so as to have as a whole the required degree of specificity, then it can withstand a vagueness challenge despite its use of a term which, when considered in isolation, has no determinate meaning.

In *Morrison v. State Bd. of Educ.*, 1 Cal. 3d 214, 461 P.2d 375, 82 Cal. Rptr. 175 (1969), the California Supreme Court considered a vagueness challenge to a statute that authorized the California State Board of Education to revoke a teacher's teaching certificate for "immoral or unprofessional conduct" and conduct "involving moral turpitude". The court recognized that "terms such as 'immoral,' 'unprofessional,' and 'moral turpitude' constitute only lingual abstractions until applied to a specific occupation and given content by reference to fitness for the performance of that vocation." 1 Cal. 3d at 239. The court therefore construed these terms in the challenged statute to refer only to conduct that indicates an unfitness to teach. 1 Cal. 3d at 225. The court held that so construed, the statute had the required specificity to withstand a vagueness challenge: "Teachers, particularly in the light of their professional expertise, will normally be able to determine what kind of conduct indicates unfitness to teach." 1 Cal. 3d at 233.

*Morrison* established that "where the language of a statute fails to provide an objective standard by which conduct can be judged, the required specificity may nonetheless be provided by the common knowledge and understanding of members of the particular vocation or profession to which the statute applies." *Cranston v. Richmond*, 40 Cal. 3d 755, 765, 710 P.2d 845, 221 Cal. Rptr. 779 (1985). A number of California decisions have reaffirmed this proposition. For example, in *Hand v. Board of Examiners in Veterinary Medicine*, 66 Cal. App. 3d 605, 136 Cal. Rptr. 187 (1977), a veterinarian's license was suspended under a statute prohibiting "[c]onduct reflecting unfavorably on the profession of veterinary medicine.'" *Hand*, at 617 n.3 (quoting Cal. Bus. & Prof. Code § 4882).[2] The California Court of Appeals declared that this statute "fails on its face to provide a standard by which conduct can be uniformly judged." *Hand*, at 622. However, following *Morrison*, the court concluded that "the required specificity is provided by common knowledge of members of the particular vocation", and so rejected a vagueness challenge to the statute. *Hand*, at 622. Similarly, in *Cranston v. Richmond, supra*, the California Supreme Court followed *Morrison* and *Hand* in rejecting a vagueness challenge to a city personnel rule under which a police officer was discharged for " '[c]onduct unbecoming an employee of the City Service.'" *Cranston*, at 762-63. "Police officers," the court explained, "like teachers and veterinarians, will normally be able to determine what kind of conduct indicates unfitness to perform the functions of a police officer." *Cranston*, at 769.

 We agree that the term "moral turpitude", standing alone and unapplied, has a meaning difficult to fathom. Reading RCW 18.130.180(1) as a whole, however, we interpret the statute as prohibiting conduct indicating unfitness to practice the profession. This interpretation is supplemented, and the statute is given further content, in two ways. First, as we explained above, the statute is ren-

---

[2]Section 4882 was repealed by 1978 Cal. Stat. 1355.

dered more specific by reference to the purposes of professional discipline: to protect the public and the profession's standing in the eyes of the public. Second, we agree with the *Morrison* court that the common knowledge and understanding of members of the particular profession to which a statute applies may also provide the needed specificity to withstand a vagueness challenge.

When RCW 18.130.180(1) is construed in relation to the purposes of professional discipline, considered in the context of a specific application, and supplemented by the shared knowledge and understanding of medical practitioners, its content is sufficiently clear as to put persons of common understanding on notice that certain conduct is prohibited. Physicians no less than teachers, as in *Morrison*, veterinarians, as in *Hand*, or police officers, as in *Cranston*, will be able to determine what kind of conduct indicates unfitness to practice their profession. The question remains whether Dr. Haley's conduct falls within the constitutional application of RCW 18.130.180(1).

Dr. Haley engaged in an extended sexual relationship with M., who was 16 years old when the relationship began, and who had been his patient until only months before. When M. initiated social contact, in March of 1987, she did so out of a desire "to see the doctor that had operated on her." Dr. Haley received her socially at his office, where he gave her wine, made sexual advances, and — by the third time she visited him — engaged her in sexual foreplay. We believe that any reasonable physician would recognize that such conduct is an abuse of the trust inherent in the physician's role and an appropriate subject for professional discipline. Dr. Haley's conduct clearly falls within the range of conduct proscribed by RCW 18.130-.180(1).

In addition, Dr. Haley was on notice that his conduct indicated an unfitness to practice insofar as it was likely to cast disrepute on the medical profession in the public's eyes. After relying on his professional status to establish the sexual relationship, his conduct during the course of the relationship was such as to offend further the profes-

sion and the public. He consistently plied M. with alcohol, in conjunction with having sex with her, over an extended period and to such an extent that questions must be raised as to whether he contributed to her becoming an alcoholic. He interfered with her relationship with her parents such that they lost all control over her and she moved out of the family home. He allowed her to stay unsupervised at a beach house that he kept stocked with alcohol. He kept her out late on school nights, causing her to fail to do her homework and to miss school the next day, circumstances that surely contributed to her eventually dropping out of school. Such conduct in relation to a former teenage patient erodes the public's trust in physicians and their medical treatment and advice, thus affecting public health.

Dr. Haley was on notice that his conduct in relation to M. indicated an unfitness to practice medicine. Therefore, we reject Dr. Haley's argument that RCW 18.130.180(1) is unconstitutionally vague.

## CONCLUSION

The Board erred in ruling that Dr. Haley's conduct constituted sexual contact with a patient, in violation of RCW 18.130.180(24). The facts before the Board did not establish, and the Board failed to find, that M. was Dr. Haley's patient at the time of their sexual contact. We agree with the Board, however, that Dr. Haley's conduct constituted conduct indicating unfitness to practice medicine, in violation of RCW 18.130.180(1). We therefore affirm the Board's decision to impose disciplinary sanctions.

Affirmed.

DORE, C.J., and DOLLIVER, ANDERSEN, DURHAM, SMITH, and JOHNSON, JJ., concur.

UTTER, J. (concurring in part, dissenting in part) — I concur in the court's decision to affirm the Board's decision to impose disciplinary sanctions on Dr. Haley. I dissent from the court's decision to overturn the Board's conclusion of law that Ms. G. was a patient of Dr. Haley at the time of

their sexual contact. Finding of fact 2.5(e), which is not appealed from, is determinative of the legal issues in this case. That finding of fact reads

> (e) [M.] was a vulnerable sixteen year old during the time most of the relationship occurred. The relationship constituted the exploitation of a juvenile for sexual gratification. The respondent exploited his position of psychological power and authority over [M.] in order to facilitate their improper sexual relationship.

Inasmuch as Dr. Haley does not contest that he was in a "position of psychological power and authority over [M.]", I believe the Board's conclusion of law is determinative that she was within the status of a "patient" as defined by RCW 18.130.180(24) during that time of her and Dr. Haley's sexual contact.

The flaw in the majority opinion is that it reads the word "current" into RCW 18.130.180(24). That word is not contained in the statute, and the Board's unchallenged finding of fact gives a satisfactory point of demarcation from which to determine if the patient/physician relationship has ceased. If a patient is still under the psychological power and authority of the physician, it should be improper for that physician to enter into a sexual relationship with her. Such an interpretation would be consistent with the evil the statute is designed to prevent: that of physicians exploiting their power and status in the patient/physician relationship to engage in sexual contact.

Had the unappealed from finding indicated that Dr. Haley was not in a position of psychological power and authority over M., I might agree that the legal status of patient could end after surgery and a brief follow-up. Those are not the facts of this case. The Board's challenged conclusion of law is supported by the unappealed finding of fact and should be affirmed.

It is ironic that even Dr. Haley's own witnesses could not agree on the date the patient/physician relationship terminated. One witness opined that the relationship ended December 1, 1986. Report of Proceedings vol. II, at 88, ll. 13-19. Another testified that, in his opinion, the physician/

patient relationship ended June 10, 1986. Report of Proceedings vol. II, at 178, ll. 7-21. Another concluded the patient/physician relationship ended 90 days after surgery, August 24, 1986. Report of Proceedings vol. III, at 9, ll. 19-23. The reason for the ambivalence on the part of Dr. Haley's witnesses is that the rapport established in the surgical relationship continued after the break in treatment. Witnesses in the case acknowledge that termination of the patient/physician relationship might be viewed differently from the patient's point of view than from the physician's point of view. Report of Proceedings vol. II, at 204, ll. 8-13; Report of Proceedings vol. III, at 45, ll. 15-24.

Dr. Haley stipulated to the Board's findings of fact, but challenged the Board's conclusions of law. In this situation, review of the administrative decision occurs under the "error of law standard" of former RCW 34.04.130(6)(d). *Public Hosp. Dist. 1, Garfield Cy. v. Department of Social & Health Servs.*, 42 Wn. App. 298, 300, 712 P.2d 298 (1985). *Compare, e.g., St. Francis Extended Health Care v. Department of Social & Health Servs.*, 115 Wn.2d 690, 801 P.2d 212 (1990) (where administrative law judge's findings of fact were not disputed, review occurs under the "error of law" standard) *with Macey v. Department of Empl. Sec.*, 110 Wn.2d 308, 752 P.2d 372 (1988) (where appellant assigned error to a finding of fact and a conclusion of law, review under the "error of law" and "clearly erroneous" standards was proper). Because our past holdings indicate that Dr. Haley's failure to assign error to the Board's findings of fact precludes judicial review under the "clearly erroneous" standard of former RCW 34.04.130(6)(e), we must review the Board's interpretation of RCW 18.130-.180(24) under the "error of law" standard.

The unappealed finding that Dr. Haley was still in a position of psychological power and authority over the minor compels me to believe there is no error of law.