[No. 52688-0-I.   Division One.   January 3, 2005.]

ALICE ONGOM, *Appellant*, v. THE DEPARTMENT OF HEALTH,
*Respondent*.

*Claudia Kilbreath* (of *Short, Cressman & Burgess, P.L.L.C.*), for appellant.

*Christine O. Gregoire, Attorney General,* and *Christopher G. Swanson, Assistant,* for respondent.

¶1 ELLINGTON, A.C.J. — In this case, a registered nursing assistant's license was suspended for abuse of a patient. We must decide what standard of proof is required in such disciplinary proceedings. We hold the preponderance of the evidence standard adequately protects the nursing assistant's due process rights. Because a preponderance of the evidence supports the findings, we affirm.

## BACKGROUND

¶2 In 2001, Alice Ongom was licensed as a registered nursing assistant and was working as a caregiver at the Woodmark Retirement Home in Federal Way. Caregivers are responsible for assisting residents with their basic needs, including feeding, dressing, and hygiene.

¶3 On February 22, Ongom and two other caregivers were cleaning the dining room after dinner. Emma Usler, a resident in the later stages of Alzheimer's who was known to be combative, was in the dining room. The following day, one of the other caregivers, Rebecca Bristlin, reported to her supervisor that Ongom had abused Usler by slapping her hands, kicking her leg, and throwing a coffee mug, which hit Usler's hands. Woodmark program director Jocelyn Umagat, L.P.N., interviewed Bristlin and other witnesses, and assessed Usler's injuries. Umagat reported the incident to police and to the Department of Health. She then spoke to Ongom and terminated her employment.

After a police investigation, Ongom was arrested and charged with fourth degree assault.[1]

¶4 The nursing assistant program of the Department of Health (the Program) initiated disciplinary proceedings against Ongom for abuse of a patient in violation of RCW 18.130.180(24).[2] After investigating, the Program issued a statement of charges, alleging that Ongom engaged in unprofessional conduct by slapping, kicking, and throwing a cup at a resident in her care.

¶5 Bristlin, Umagat and Ongom testified at a hearing before a health law judge. Ongom, who represented herself at the hearing, maintained she had not abused Usler. She testified that Usler was often aggressive, and that on this occasion Usler threw a glass at Ongom, hitting her, and shouted racial insults. Ongom testified she grabbed a plate from Usler to prevent her from throwing it, and left the room. Ongom presented an affidavit from the third witness to the incident, caregiver Franciska Chmielewski, who confirmed that Usler was frequently aggressive and stated she saw Usler throw a glass at Ongom, but did not see Ongom touch or throw anything at Usler.

¶6 Health law judge John F. Kuntz observed that the correct standard of proof—a preponderance of the evidence, or clear and convincing evidence—appeared to be an unsettled question. He therefore considered the evidence under both standards and concluded the Program had "proven by a preponderance of the evidence, but not by clear and convincing evidence, that [Ongom's] conduct violated RCW 18.130.180(24) (regarding abuse of a client). The Presiding Officer concludes this violation was moderate in

---

[1] The record shows that the court dismissed the charges on its own motion.

[2] RCW 18.130.180 provides, in part: "The following conduct, acts, or conditions constitute unprofessional conduct for any license holder or applicant under the jurisdiction of this chapter: . . . . (24) Abuse of a client or patient or sexual contact with a client or patient."

nature."[3] Judge Kuntz ordered Ongom's license be suspended for 24 months.[4]

¶7 Ongom petitioned the superior court for judicial review. That court affirmed the use of the preponderance standard and upheld the decision to suspend Ongom's license. This appeal followed.

## DISCUSSION

### Due Process

¶8 Judicial review of a Department of Health administrative decision is governed by the Administrative Procedure Act.[5] This court applies the standards of the Act directly to the record before the agency.[6] In reviewing conclusions of law, we apply the "error of law" standard of RCW 34.05.570(3)(d), under which we give substantial weight to the agency's interpretation of the law, but are not bound by the agency's interpretation.[7]

¶9 A disciplinary proceeding like Ongom's requires the license holder to defend against charges of unprofessional conduct and may result in license revocation. It must therefore comport with due process.[8]

¶10 In *Mathews v. Eldridge*,[9] the United States Supreme Court delineated three factors to be balanced in determining the minimum process required by the federal constitution: the private interest affected by the proceeding, the risk of error created by the State's chosen procedure,

[3] Clerk's Papers at 17.

[4] Ongom's license would have been restored in July 2004. The discipline remains a matter of record, however, and the Department does not argue the matter is moot.

[5] Ch. 34.05 RCW.

[6] *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

[7] *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991).

[8] *See Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 474, 663 P.2d 457 (1983).

[9] 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

and the countervailing government interest supporting the use of the challenged procedure.[10] In *Addington v. Texas*[11] and especially in *Santosky v. Kramer*,[12] the Court applied these factors to the question of the proper standard of proof.[13]

¶11 Ongom relies upon our Supreme Court's decision in *Nguyen v. Department of Health*,[14] and argues that the standard of proof required by due process in all professional disciplinary proceedings is clear and convincing evidence. In *Nguyen*, the Medical Quality Assurance Commission found, by a preponderance of the evidence, that Dr. Bang Nguyen committed unprofessional conduct. The Commission revoked the doctor's license to practice medicine and prohibited him from seeking relicensure for five years. Our Supreme Court reversed. The *Nguyen* court framed the issue before it as follows: "At its heart this case concerns the process due an accused physician by the state before it may deprive him his interest in property and liberty represented by his professional license."[15] The court found that a physician's property and liberty interests in maintaining his or her license are compelling; that the risk of error was aggravated by the subjective nature of the charges and by the fact that the Commission acted as investigator, prosecutor, and decision maker; and that the government's interest in avoiding the additional burden associated with a more stringent evidentiary standard was minimal.[16] Applying the factors set forth in *Mathews* and *Addington* to these

---

[10] *Id.* at 335.

[11] 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

[12] 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[13] The Washington Supreme Court has observed that the *Mathews* factors "have some uneven relevance and application" to the burden of proof issue. *Nguyen v. Dep't of Health*, 144 Wn.2d 516, 526, 29 P.3d 689 (2001) (citing *Santosky*, 455 U.S. at 747).

[14] 144 Wn.2d 516, 526, 29 P.3d 689 (2001).

[15] *Id.* at 522.

[16] *Id.* at 527-33.

circumstances, the court held that due process required proof by clear and convincing evidence.

¶12 "The function of the standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' "[17] The *Nguyen* court did not address whether the standard of proof is the same when a different professional license (and therefore a different private interest) is involved. In *Eidson v. Department of Licensing*,[18] we held that the standard depends upon an analysis of the interests involved and concluded the preponderance standard provided adequate due process protection in proceedings to revoke the license of a real estate appraiser.[19]

¶13 Here, we must decide what standard applies to revocation of the license of a registered nursing assistant. We address the *Mathews* factors in turn.

¶14 *Private Interest.* As *Nguyen* pointed out, "It is important to focus on the nature of the interest at stake in the sense that the more important the interest, the more process is required."[20] The license of a registered nursing assistant is a significant property interest, because it allows an individual to earn a living within a chosen field. It is not, however, equivalent to a medical license for purposes of due process analysis.

¶15 A physician completes many years of rigorous education, training, and examination at enormous expense,

---

[17] *Addington*, 441 U.S. at 423 (quoting *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring)).

[18] 108 Wn. App. 712, 720-21, 32 P.3d 1039 (2001).

[19] We are aware that Division Two of this court has broadly interpreted *Nguyen* to apply to all professional disciplinary proceedings. *Nims v. Bd. of Prof'l Eng'rs & Land Surveyors*, 113 Wn. App. 499, 53 P.3d 52 (2002). We disagree with that court's position that this question merits no case-by-case analysis, such as the one we conducted in *Eidson*.

[20] 144 Wn.2d at 525-26.

and generally expects the practice of medicine to be a permanent career. Registered nursing assistants, by contrast, have no educational or training requirements at all,[21] perform duties only as delegated and supervised by nurses,[22] and are employed in a field plagued by chronic and frequent turnover.[23] The legislature provided for a "voluntary certification of those who wish to seek higher levels of qualification," which requires some training and competency evaluation,[24] but even so, the value of the license to the holder is markedly different for nursing assistants than for physicians.

¶16 Additionally, the purpose of the license must be considered. By statute, any person can obtain a nursing assistant license by simply submitting an application and paying a nominal fee.[25] In fact, an applicant need not even obtain the license before beginning work as a nursing assistant.[26] The purpose of the nursing assistant license, therefore, appears to be solely to satisfy the need for a registry of those allowed to work in the field. The purpose of the medical license, on the other hand, is to assure professional competence in a highly complex and potentially dangerous occupation, in which the practitioner is largely unsupervised and poses a great risk to the public if incom-

---

[21] RCW 18.88A.080.

[22] RCW 18.88A.020(4).

[23] RCW 18.88A.010 (acknowledging "the high and often critical turnover among the principal cadre of health care workers who provide for the basic needs of patients").

[24] RCW 18.88A.010, .085. WAC 246-841-490 provides that approved training programs must cover certain core competencies and must consist of no less than 85 hours of classroom and clinical training.

[25] RCW 18.88A.080 provides that "[t]he secretary [of health] shall issue a registration to any applicant who pays any applicable fees and submits, on forms provided by the secretary, the applicant's name, address, and other information as determined by the secretary." RCW 18.88A.085 provides that the secretary "shall issue a certificate to any applicant who demonstrates" he or she had satisfied the requirements of completion of an approved training program and competency evaluation. WAC 246-841-990 establishes a $15 application fee for registration and an equal fee for certification.

[26] RCW 18.88A.080(2) ("Applicants must file an application with the commission for registration within three days of employment.").

petent.[27] To this end, the education and examination requirements are extensive.[28] Thus, the property interest in a nursing assistant's license, while not insignificant, is considerably more limited than the property interest in a license to practice medicine.

¶17 The *Nguyen* court also characterized the doctor's interest in his medical license as a liberty interest: "[T]his court has recognized a doctor has a liberty interest in preserving his professional reputation."[29] The distinctions we noted above in terms of the property interest apply in equal measure here. A nursing assistant who loses her license may suffer some slight damage to her reputation, but any such damage does not approach the significant stigma attached to loss of the right to practice medicine. The liberty interest here, if any, is nominal.

¶18 In *Addington*, the United States Supreme Court considered whether due process requires an elevated standard of proof in involuntary civil commitment proceedings, and held the proof must be greater than a preponderance but need not be beyond a reasonable doubt. In discussing the three evidentiary standards and the sorts of proceedings to which each applied, the Court observed that the intermediate clear and convincing standard of proof applies in civil cases involving "allegations of fraud or some other quasi-criminal wrongdoing by the defendant."[30] The *Nguyen* court emphasized the quasi-criminal nature of

[27] RCW 18.71.002 ("It is the purpose of the medical quality assurance commission to regulate the competency and quality of professional health care providers under its jurisdiction by establishing, monitoring, and enforcing qualifications for licensing, consistent standards of practice, continuing competency mechanisms, and discipline.").

[28] RCW 18.71.050 establishes eligibility requirements for a license to practice medicine, which include proof the applicant has attended and graduated from an approved school of medicine and completed two years of postgraduate medical training, is of good moral character, and is physically and mentally capable of safely carrying on the practice of medicine. RCW 18.71.070 provides applicants must also successfully complete an examination covering subjects and topics, knowledge of which is generally required of a candidate for a degree of doctor of medicine.

[29] 144 Wn.2d at 527.

[30] *Addington*, 441 U.S. at 424.

medical disciplinary proceedings in concluding that due process requires proof by clear and convincing evidence.[31] Ongom contends this analysis should apply in disciplinary proceedings against a nursing assistant.

■■ ■■ ¶19 But the phrase "quasi-criminal" can be logically applied to all license revocation procedures because the license holder is called upon to defend against allegations made by the government with the aim of protecting the public, and the consequences are punitive in the sense that a privilege may be withdrawn. The quasi-criminal character of the proceedings must be taken into consideration in evaluating the private interest at stake, but it does not, standing alone, mandate application of a heightened standard of proof. As the *Nguyen* court noted, the United States Supreme Court has mandated the intermediate standard of proof only when the individual interests at stake are "both particularly important and more substantial than money."[32] In other words, the clear and convincing standard provides the "level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual with 'a significant deprivation of liberty' or 'stigma.' "[33] Thus, "[w]hether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss."[34]

¶20 As discussed above, a registered nursing assistant license is available for the asking and requires no significant financial or educational investment. The license does not amount to a compelling property or liberty interest, nor does its loss carry with it a significant stigma. In addition, Ongom's license was suspended for only 24 months,

[31] 144 Wn.2d at 529.

[32] *Santosky*, 455 U.S. at 756; *see Nguyen*, 144 Wn.2d at 529.

[33] *Santosky*, 455 U.S. at 756 (quoting *Addington*, 441 U.S. at 425-26).

[34] *Id.* at 758.

whereas Bang Nguyen's license was indefinitely revoked and he was prohibited from seeking relicensure for five years.

¶21 Ongom's interest in retaining her license is important. But the minimal effort required to obtain such a license, the limited work it authorizes the holder to perform, and the relatively minor (if any) stigma associated with its temporary suspension do not constitute a private interest that mandates an elevated standard of proof. We therefore proceed to the other *Mathews* factors.

¶22 *Risk of Error.* The procedural protections afforded to a nursing assistant in disciplinary proceedings are many. The Uniform Disciplinary Act (UDA)[35] requires that when a complaint is filed, it be evaluated to determine whether an investigation is warranted. If so, the investigator must inform the licensee in writing of the nature of the complaint, the licensee's right to consult with legal counsel prior to making a statement, and the fact that any statement may be used in an adjudicative proceeding under the UDA.[36] If the agency decides to act upon a complaint after investigation, the Administrative Procedure Act, chapter 246-10 WAC, affords numerous procedural safeguards, including a public hearing before an unbiased tribunal, notice of the proposed action, the right to present evidence and argument and to know the government's evidence, the right to have a decision based only on the evidence presented, the opportunity to be represented by counsel, the making of a record, a statement of the reasons for the decision, and the right to judicial review.[37]

¶23 Ongom does not contend she was deprived of any of these protections. Instead she relies on *Nguyen* for the proposition that these protections cannot substitute for the proper burden of proof.

---

[35] Ch. 18.130 RCW.

[36] RCW 18.130.095(2)(a).

[37] RCW 18.130.100; RCW 34.05.446(3), .449, .461(4), .510-.598; ch. 246-10 WAC; *see also Nguyen*, 144 Wn.2d at 545 (Ireland, J., dissenting).

¶24 The *Nguyen* court emphasized two factors in its risk of error analysis: the subjective nature of the charges against the physician, and the fact that the agency " 'acts as investigator, prosecutor, and decision maker.' "[38] The court concluded that the subjective standard of conduct applied by the Commission, along with deferential judicial review, created an unacceptable risk of erroneous deprivation of constitutionally protected interests. Indeed, the court characterized the charges against the doctor, which included incompetence, negligence, malpractice, moral turpitude, dishonesty and corruption, as "almost entirely subjective in nature," and observed that a physician's standard of care is necessarily a matter of opinion.[39] The claims against Ongom, in contrast, are not at all subjective. She was accused of slapping, kicking, and throwing objects at a patient under her care. Whether or not such conduct violates the statute prohibiting abuse of a patient is hardly a subjective matter. The use of an objective standard lessens the need for a more stringent standard of proof.[40]

¶25 In *Nguyen*, the Medical Quality Assurance Commission investigated and monitored the doctor's conduct, ordered him to be assessed by an educational program, preferred the charges against him, and ultimately sat in judgment of him. Although Nguyen and Ongom were disciplined under the same statutes, the procedures differed significantly. The proceedings against Nguyen were adjudicated by the Commission itself, "consisting largely of professional peers, rather than solely by administrative law judges or other judicial officers."[41] Ongom's case, however, was decided by an administrative law judge. Use of a professional judicial officer lessens the influence of the agency seeking discipline and tends to ensure independent and unbiased judgment.

---

[38] *Nguyen*, 144 Wn.2d at 530-31 (quoting *Painter v. Abels*, 998 P.2d 931, 941-42 (Wyo. 2000)).

[39] *Id.* at 531.

[40] *See Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 720, 32 P.3d 1039 (2001).

[41] *Nguyen*, 144 Wn.2d at 545 (Ireland, J., dissenting).

¶26 The procedural protections afforded to nursing assistants minimize any risk of error and support a preponderance standard of proof in disciplinary proceedings.

¶27 *Government Interest.* Ongom suggests the only government interest at issue is the additional fiscal burden on the State to employ a higher standard of proof. We disagree. It is clear that the government has a substantial interest in protecting the public from incompetent or abusive nursing assistants.[42] Regrettably, the minimal qualifications, poor compensation, arduous tasks, and high demand for nursing assistants encourages high turnover, which makes it easy for nursing assistants to escape discipline by moving from one job to the next. Additionally, nursing assistants, by definition, work with extremely vulnerable individuals who are unable to satisfy their own basic needs for daily living. Many will be unable to report abuse or testify in disciplinary proceedings. Indeed, the record here indicates that Usler could not remember how she had been injured shortly after it happened. A preponderance of the evidence standard of proof makes it more likely that abusive or unscrupulous nursing assistants are properly disciplined.

¶28 While an individual's interest in his or her license to practice as a nursing assistant is significant, it is outweighed by the public interest in protecting patients. We therefore hold that requiring the Program to prove its case by a preponderance of the evidence adequately protects both Ongom's interests and those of the public.

Substantial Evidence

¶29 An agency's findings of fact are reviewed under the substantial evidence standard of RCW 34.05.570(3)(e). "Substantial evidence is 'evidence in sufficient quantum to

---

[42] *See, e.g., Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 449, 74 S. Ct. 650, 98 L. Ed. 829 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health.").

persuade a fair-minded person of the truth of the declared premises.' "[43] This standard requires us to "view 'the evidence and the reasonable inferences therefrom in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority, a process that necessarily entails acceptance of the factfinder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences.' "[44]

¶30 Ongom contends the Department's decision to suspend her license is not supported by substantial evidence. She points out that of the three witnesses to the incident (Bristlin, Chmielewski, and herself), only one (Bristlin) provided testimony supporting the charges. But Woodmark program director Jocelyn Umagat testified she found a half-dollar sized bruise and swelling on Usler's leg, which corroborated Bristlin's report.

¶31 In the end, the health law judge had to choose between the contradictory statements of Ongom and Bristlin. Ongom contends Bristlin's testimony was not credible. But the administrative law judge concluded otherwise, and it is not for us to judge the credibility of witnesses or the weight to be given conflicting evidence.[45] Bristlin's statements were corroborated by her contemporaneous notes in the patient progress log and by Umagat's assessment of Usler's injuries; Ongom's testimony was undercut by inconsistent statements about the incident. The credibility and weight to be given this evidence was for the trial judge. We agree with the health law judge that the State produced substantial evidence to prove by a preponderance that Ongom abused a patient under her care.

¶32 We hold the proper standard of proof in nursing assistant disciplinary proceedings is a preponderance of the

[43] *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 607, 903 P.2d 433 (1995) (quoting *Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994)).

[44] *Freeburg v. City of Seattle*, 71 Wn. App. 367, 371-72, 859 P.2d 610 (1993) (quoting *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 619, 829 P.2d 217 (1992)).

[45] *Id.*

evidence and that the evidence satisfied this standard here. We therefore affirm.

COLEMAN and SCHINDLER, JJ., concur.

Review granted at 155 Wn.2d 1001 (2005).