# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHANTANU NERAVETLA, M.D., | No. 48394-7-II |
| Appellant, | |
| v. | |
| DEPARTMENT OF HEALTH, STATE OF WASHIGNTON, | PUBLISHED OPINION |
| Respondent. | |

MELNICK, J. — Shantanu Neravetla, M.D. appeals the Department of Health, Medical Quality Assurance Commission's (MQAC) final order requiring him to undergo a psychological evaluation if he seeks licensure in Washington. MQAC found that Neravetla had a "mental condition" that affected his ability to practice with reasonable skill and safety.

We conclude that MQAC did not err in its interpretation of the term "mental condition" and that the statute at issue[1] is not unconstitutionally vague. Further, MQAC did not violate Neravetla's due process rights, sufficient evidence exists to support the decision, MQAC's decision was not arbitrary and capricious, and the presiding officer did not violate the appearance of fairness doctrine. We do not review the summary judgment motion denial or consider the evidentiary issues raised. We affirm.

---

[1] RCW 18.130.170.

FACTS

In June 2011, Neravetla began a one-year residency program at Virginia Mason Medical Center (VMMC) in Seattle. In the initial weeks of the program, the residency program director, Dr. Larry Keith Dipboye Jr., received complaints about Neravetla's performance. They related to his professionalism, accountability, attendance, communication, and patient care. Dipboye and Gillian Abshire, the manager of the Graduate Medical Education program, gave Neravetla a verbal warning. Nonetheless, Neravetla continued to have issues with attendance and communication. VMMC gave Neravetla a written warning and placed him on probation. A social worker also filed a patient safety alert with VMMC because of Neravetla's "belligerent" interactions with a nurse. Administrative Record (AR) at 1962.

Dipboye and VMMC then required Neravetla to attend coaching sessions and a class with Dan O'Connell, Ph.D., a psychologist and communication skills coach. O'Connell found Neravetla to be "bitterly angry, with little insight and little ability to reflect on his own behavior in relationships with others." Clerk's Papers (CP) at 25.

On February 9, 2012, VMMC referred Neravetla to the Washington Physicians Health Program (WPHP) for a mental status evaluation. The referral occurred because of Neravetla's interaction with the nurse in the patient safety alert incident and Neravetla's failure to take accountability for his actions or adequately process direct feedback on his behavior.

Two doctors from the clinical staff at WPHP evaluated Neravetla. Both doctors found Neravetla to be disconnected and non-responsive to queries. They also found him to be "confused, defensive, angry, and upset, raising his voice with the interviewers." CP at 25. He also brought WPHP's receptionist to tears. Based on their assessments, WPHP referred Neravetla to obtain a

comprehensive evaluation at Pine Grove Behavioral Health Center, one of three recommended evaluators.

Neravetla presented himself to Pine Grove without informing WPHP. Psychiatrist, Teresa Mulvihill, M.D., and psychologist, Ed Anderson, Ph.D., evaluated him. Anderson evaluated Neravetla as "defensive, lacking insight, blame-shifting, and denying and minimizing how his internship was at risk at VMMC." CP at 26. The Pine Grove evaluators made their evaluation based on their interactions with Neravetla, and information provided by both VMMC and Neravetla. Pine Grove diagnosed Neravetla with an "Occupational problem (disruptive behavior) (Axis I); and prominent obsessive-compulsive and narcissistic traits (R/O personality disorder NOS with obsessive-compulsive and narcissistic traits) (Axis II)."[2] CP at 26. The Pine Grove evaluators did not feel comfortable recommending that Neravetla return to his residency and recommended that before that occurred, he participate in an intensive six-week residential treatment. Pine Grove did not diagnose Neravetla with any mental illness.

WPHP reported Neravetla to MQAC. WPHP indicated its concern about Neravetla's ability to practice medicine because Neravetla had had no contact with WPHP and WPHP did not know where Neravetla was. WPHP did not know Neravetla had gone to Pine Grove for an evaluation. Subsequently, the residency program terminated Neravetla and VMMC held a grievance hearing. Neravetla's limited license expired in July 2012.

On March 18, 2013, MQAC issued charges against Neravetla. It alleged that sanctions should be imposed because Neravetla was "unable to practice with reasonable skill and safety pursuant to RCW 18.130.170(1)." AR at 5.

---

[2] MQAC did not find that Neravetla suffered from a personality disorder.

Neravetla denied the allegations and asserted that no grounds existed to impose sanctions. He asserted defenses, including that he did not suffer from any mental disorder[3] and that MQAC lacked jurisdiction.

Neravetla filed a motion for summary judgment before MQAC, arguing that substantial evidence did not exist to prove he could not practice with reasonable skill and safety because of a mental condition. He included expert reports that concluded he had never been diagnosed with any mental illness and that he was fit for duty.

The presiding officer[4] denied Neravetla's motion for summary judgment because genuine issues of material fact existed regarding Neravetla's ability to practice with reasonable skill or safety because of a mental condition.

MQAC held a hearing on the charges. At the beginning of the hearing, the presiding officer asked a member of MQAC's panel, Dr. Thomas Green, a former VMMC employee, whether he could hear and assess the case in an impartial manner. Green stated that although he did know some of the people involved in the case, he had no doubt about his ability to give Neravetla a fair hearing. Green agreed to voice any concerns about his impartiality throughout the proceedings.

After hearing testimony, MQAC entered a final order and findings of fact and conclusions of law.[5] MQAC made specific credibility determinations in its findings of fact. MQAC determined that the clinic staff from WPHP were credible because their descriptions of their

---

[3] Neravetla initially said he did not suffer from a narcissistic personality disorder, but later expanded it to any mental disorder.

[4] MQAC hearings are adjudicated by five MQAC members, with a presiding officer who is a "health law judge." AR at 1835.

[5] Neravetla does not assign error to any finding of fact. Findings of fact are verities on appeal. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993).

4

interactions with Neravetla were consistent. In addition, it found Pine Grove's staff and O'Connell to be credible.

MQAC accepted Anderson's conclusion that Neravetla suffered from the condition of Disruptive Physician Behavior, an occupational problem. Neravetla's demeanor as testified to by witnesses, was consistent with the diagnosis. MQAC found that this occupational problem interfered with Neravetla's ability to communicate and work with others, and if continued, would impede his ability to practice medicine safely. His occupational problem rose to the level that patient care would be adversely affected.

MQAC's conclusions of law stated in relevant part:

> 2.4 The Department proved by clear and convincing evidence that [Neravetla's] ability to practice with reasonable skill and safety was sufficient impaired by an occupational problem to trigger the application of RCW 18.130.170(1). . . .
> 2.5 In determining the appropriate sanctions, public safety must be considered before the rehabilitation of [Neravetla]. RCW 48.130.160. . . .
> 2.6 The Department requests that [Neravetla] be ordered to comply with the Pine Grove treatment recommendations. The Commission declines to do this.

CP at 32-33. The final order provided that if Neravetla sought licensure in Washington for a health care credential, he "shall undergo a psychological evaluation by a WPHP approved evaluator and follow whatever recommendations are contained in that evaluation." CP at 33.

Neravetla filed a petition for judicial review to set aside MQAC's final order. The superior court affirmed the MQAC decision. Neravetla appeals.

ANALYSIS

I.    MENTAL CONDITION

Neravetla argues that MQAC committed legal error by creating an "Amorphous and Arbitrary" standard for the term "Mental Condition." Br. of Appellant at 26. He also argues that

MQAC conflated the requirement that he have a mental condition that prevents him from practicing safely with unprofessional conduct.[6]  We disagree.

A.    LEGAL PRINCIPLES

We review this case under the Administrative Procedure Act (APA),[7] and directly review the agency record.  *Ames v. Health Dep't Med. Quality Health Assurance Comm'n*, 166 Wn.2d 255, 260, 208 P.3d 549 (2009).  We may reverse an administrative order (1) if it is based on an error of law, (2) if it is unsupported by substantial evidence, (3) if it is arbitrary or capricious, (4) if it violates the constitution, (5) if it is beyond statutory authority, or (6) when the agency employs improper procedure.  *Ames*, 166 Wn.2d at 260; RCW 34.05.570(3) (a), (b), (c), (d), (e), (h), (i).

When reviewing an administrative agency decision, we review issues of law de novo.  *Ames*, 166 Wn.2d at 260.  We may "then substitute our judgment for that of the administrative body on legal issues."  *Ames*, 166 Wn.2d at 260-61.  However, we should "accord substantial weight to the agency's interpretation of the law it administers—especially when the issue falls within the agency's expertise."  *Ames*, 166 Wn.2d at 261.

"[T]he challenger has the burden of showing the department misunderstood or violated the law, or made decisions without substantial evidence."  *Univ. of Wash. Med. Ctr. v. Dep't of Health*,

---

[6] We accepted an amicus curiae brief from the Legal Aid Society-Employment Law Center. Amicus raises many issues not raised by Neravetla.  We may, but usually do not, reach arguments raised only by amicus.  *State v. Duncan*, 185 Wn.2d 430, 440, 374 P.3d 83 (2016).  We do not reach the issues raised solely in the amicus curiae brief.

MQAC filed a brief in response to amicus curiae's brief.  Neravetla filed a motion to strike MQAC's appendix in its response brief to amicus curiae's brief.  We grant Neravetla's motion to strike.

[7] Ch. 34.05 RCW.

164 Wn.2d 95, 103, 187 P.3d 243 (2008). "We do not reweigh the evidence." *Univ. of Wash. Med. Ctr.*, 164 Wn.2d at 103.

We review "a challenge to an agency's statutory interpretation and legal conclusions de novo under the error of law standard." *Greenen v. Wash. State Bd. of Accountancy*, 126 Wn. App. 824, 830, 110 P.3d 224 (2005). "If a statute's meaning is plain, then the court must give effect to the plain meaning as expressing what the legislature intended." *Campbell v. Dep't of Soc. & Health Servs.*, 150 Wn.2d 881, 894, 83 P.3d 999 (2004). We evaluate a statute's plain language to determine legislative intent. *Greenen*, 126 Wn. App. at 830. "Under the plain meaning rule, courts derive the meaning of a statute from the 'wording of the statute itself.'" *Strain v. W. Travel, Inc.*, 117 Wn. App. 251, 254, 70 P.3d 158 (2003) (quoting *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991)).

"A statute is ambiguous when, either on its face or as applied to particular facts, it is fairly susceptible to different, reasonable interpretations." *Strain*, 117 Wn. App. at 254. If the plain language is ambiguous, we "may review the statute's legislative history, including legislative bill reports, to help determine a statute's intent." *Greenen*, 126 Wn. App. at 830. We examine the statute as a whole and its statutory interpretation must not create an absurd result. *State v. Larson*, 184 Wn.2d 843, 851, 365 P.3d 740 (2015)..

B.    MQAC CORRECTLY INTERPRETED THE LAW

1.    The Term "Mental Condition"

Neravetla argues that MQAC incorrectly interpreted the term "mental condition" too broadly and that it must mean a diagnosable mental illness. We disagree.

The term "mental condition" is contained in RCW 18.130.170(1) which states:

If the disciplining authority believes a license holder may be unable to practice with reasonable skill and safety to consumers by reason of any mental or physical condition, a statement of charges in the name of the disciplining authority shall be served on the license holder and notice shall also be issued providing an opportunity for a hearing. *The hearing shall be limited to the sole issue of the capacity of the license holder to practice with reasonable skill and safety.* If the disciplining authority determines that the license holder is unable to practice with reasonable skill and safety for one of the reasons stated in this subsection, the disciplining authority shall impose such sanctions under RCW 18.130.160 as is deemed necessary to protect the public.

(Emphasis added).

Another section of this statute illustrates that the legislature recognized that a diagnosable mental illness is not synonymous with a mental condition. "A determination by a court of competent jurisdiction that a license holder is mentally incompetent or an individual with mental illness is presumptive evidence of the license holder's inability to practice with reasonable skill and safety." RCW 18.130.170(2)(f). The unambiguous plain language of the statute shows that a mental condition is not the equivalent of a diagnosable mental illness. The plain language provides that any mental condition that causes the license holder to be unable to practice safely would satisfy the statute. RCW 18.130.170(1). The goal of the statute is to protect consumers and insure that the license holder practices with reasonable skill and safety.

MQAC's policy statement defines disruptive behavior as "Personal conduct, whether verbal or physical, that negatively affects or that potentially may negatively affect patient care. (This includes but is not limited to conduct that interferes with one's ability to work with other members of the health care team.)" AR at 1107. MQAC's policy statement defines disruptive behavior as including conduct that interferes with one's ability to work with other members of the health care team. In addition, the statement provides examples of disruptive behavior including: difficulty working collaboratively with others, failing to respond to repeated calls, and responding poorly to corrective action. MQAC's policy statement states that hospitals should address a

practitioner exhibiting disruptive behavior "before the quality of care suffers, or complaints are lodged." AR at 1108. MQAC's policy statement provides support for its interpretation and conclusion that disruptive behavior can limit a practitioner's ability to practice with reasonable skill and safety.

Therefore, we conclude that MQAC did not err in its interpretation of the term "mental condition." Neravetla's occupational problem, disruptive physician behavior, would satisfy the requirements of the statute's provision despite not being a diagnosable mental illness in the Diagnostic and Statistical Manual.

2. MQAC Did Not Conflate Mental Condition with Unprofessional Conduct

Neravetla also argues that MQAC conflated the requirement that he have a mental condition that prevents him from practicing safely with unprofessional conduct. He claims this conflation constitutes a legal error because MQAC made conclusions that would only be appropriate under the latter statute that governs unprofessional conduct. We disagree.

RCW 18.130.180 lists approximately twenty-five types of "conduct, acts, or conditions [that] constitute unprofessional conduct for any license holder." However, none of the options listed relates to the alleged actions and behavior of Neravetla or the charges asserted against him. Neravetla does not identify which part of RCW 18.130.180 MQAC conflated with RCW 18.130.170.[8] MQAC focused on Neravetla's mental condition and his ability to safely treat the public and not whether he committed an act or conducted himself in an unprofessional manner.

---

[8] The only option that could possibly be related is: "Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed." RCW 18.130.180(4). Yet, Neravetla was not accused of incompetence, negligence, or malpractice, nor was there a specific event focused on by MQAC to establish one of the three.

Therefore, we conclude that MQAC did not err by its interpretation of the statute and that the argument that MQAC conflated the requirements of the statutes is without merit.

II.     VAGUENESS

Neravetla argues that RCW 18.130.170 is unconstitutionally vague if the term "mental condition" includes undefined disruptive behavior because it opens the door for doctors to be charged for almost any type of conduct. He argues that if under RCW 18.130.170 disruptive behavior can be characterized as a mental condition, the statute is unconstitutionally vague. We disagree and conclude that the statute is not unconstitutionally vague.

The protections of due process apply to medical disciplinary proceedings. *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 739, 818 P.2d 1062 (1991). A vague statute offends due process. *In re Disciplinary Proceedings Against Curran*, 115 Wn.2d 747, 758, 801 P.2d 962 (1990). "Therefore, any statute under which sanctions may be imposed for unprofessional conduct must not be unconstitutionally vague." *Haley*, 117 Wn.2d at 739.

Statutes are presumed to be constitutional. *Haley*, 117 Wn.2d at 739. "The party challenging a statute's constitutionality on vagueness grounds has the burden of proving its vagueness beyond a reasonable doubt." *Haley*, 117 Wn.2d at 739. "A statute is void for vagueness if it is framed in terms so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Haley*, 117 Wn.2d at 739 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926)). The purpose of the vagueness doctrine is to ensure that citizens receive fair notice as to what conduct is proscribed, and to prevent the law from being arbitrarily enforced. *City of Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366 (1988).

"Some measure of vagueness is inherent in the use of language." *Haley*, 117 Wn.2d at 739. "[A] statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct." *Eze*, 111 Wn.2d at 27. "[T]he common knowledge and understanding of members of the particular profession to which a statute applies may also provide the needed specificity to withstand a vagueness challenge." *Haley*, 117 Wn.2d at 743.

In *In re Ryan*, 97 Wn.2d 284, 287, 644 P.2d 675 (1982), Ryan challenged the discipline rules for the Washington State Bar Association, and argued that the terms "mental illness or other mental incapacity" were too vague to withstand constitutional challenge. In rejecting his argument, the court upheld the rules because "the mental condition must cause the attorney to be unable to conduct his/her law practice adequately. . . . Thus, the Bar must establish that an attorney is unable to conduct the practice of law adequately because of insanity, mental illness, senility, excessive use of alcohol or drugs, or other mental incapacity." *Ryan*, 97 Wn.2d at 288. The court further reasoned that "[g]iven the inherently uncertain nature of mental illness and the broad ranges of the practice of law, we fail to perceive how a more definite standard could be articulated, and Ryan has suggested none." *Ryan*, 97 Wn.2d at 288.

Here, the statute for physician discipline is similar because the mental condition must render the physician unable to practice medicine safely. Reading the statute as a whole, a person of common intelligence would likely conclude that the term does not require an actual diagnosable mental illness, only a mental condition that affects a person's ability to work with patients safely. Therefore, we conclude that the statute is not unconstitutionally vague.

III.    DUE PROCESS VIOLATIONS

Neravetla argues that the statement of charges violated his right to notice because it did not apprise him of the substance of the issues.[9]  He argues that the substance of the proceedings changed to focus on his conduct and not whether he had a mental condition, so he was prejudiced in his ability to prepare evidence to counter MQAC's case.  However, Neravetla fails to show how the alleged lack of notice prejudiced him.  He only argues in his brief that at the prehearing conference he asked for more time to conduct more discovery and find additional witnesses and documents; MQAC denied the request.

In addition, he argues that the final order violates due process because it is impossible for him to comply with it.  Because Neravetla received proper notice and because he could have complied with the order, we disagree.

A.    LEGAL PRINCIPLES

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  "A medical license is a constitutionally protected property interest which must be afforded due process." *Nguyen v. Dep't of Health Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 523, 29 P.3d 689 (2001). "[T]he applicability of the constitutional due process guaranty is a question of law subject to de novo review. *Durland v. San Juan County*, 182 Wn.2d 55, 70, 340 P.3d 191 (2014).

---

[9] It is not disputed that Neravetla held a protected property interest.

B.     NOTICE OF THE ALLEGATIONS

Neravetla's argument that he did not receive notice of the charges is without merit.  In a case involving disciplinary proceedings against an attorney, the charging document "must state the respondent's acts or omissions in sufficient detail to inform the respondent of the nature of the allegations of misconduct." *In re Disciplinary Proceeding Against Marshall*, 167 Wn.2d 51, 70, 217 P.3d 291 (2009) (internal quotations omitted).  Due process requires that a respondent "be notified of clear and specific charges and . . . be afforded an opportunity to anticipate, prepare, and present a defense." *Marshall*, 167 Wn.2d at 70 (internal quotations omitted).

Here, Neravetla was apprised of the charges against him.  The charging document stated that sanctions should be imposed because Neravetla was "unable to practice with reasonable skill and safety pursuant to RCW 18.130.170(1)."  AR at 5.  The statement of charges included a quote of RCW 18.130.170(1) that clearly identified Neravetla's inability to practice safely occurred because of a mental or physical condition.  Neravetla claims he was only charged with a mental disorder, but he was actually charged with a mental condition.  He also claims that the evidence focused on conduct, but that was evidence of a mental condition.  In addition, the "alleged facts" section of the document explicitly described the facts MQAC relied on in asserting charges, including that he had an "occupational problem/disruptive behavior."  AR at 4.  Neravetla does not identify how this was insufficient other than the arguments we reject above.  MQAC did not assert any other mental condition at the hearing, and therefore, Neravetla received adequate notice of the charges he faced.  Accordingly, we conclude that Neravetla received sufficient notice of the charges against him.

C.       IMPOSSIBILITY OF COMPLIANCE WITH FINAL ORDER

Neravetla argues that the order violates his due process rights because it is impossible for him to comply.  He asserts that the order's sanctions are "conditioned upon (1) Dr. Neravetla getting another residency position, and (2) getting that position in Washington."  Br. of Appellant at 45.  He claims he is unable to satisfy the order unless those preconditions are met.  We disagree with Neravetla's interpretation of the order; he can comply with it.

The order provides: "In the event that [Neravetla] seeks licensure in the state of Washington for a health care credential, [Neravetla] shall undergo a psychological evaluation by a WPHP approved evaluator and follow whatever recommendations are contained in that evaluation."  CP at 33.  The order does not require Neravetla to seek another residency in Washington.  It merely states what he must do if he seeks licensure in Washington for a health care credential.  Because Neravetla can comply with the order, it does not violate his due process rights and his argument fails.

IV.    INSUFFICIENT EVIDENCE

Neravetla argues that substantial evidence did not support the finding that he could not practice medicine with reasonable skill and safety.[10]  We disagree.

Neravetla did not assign error to the agency's findings of fact in the final order, therefore, they are verities on appeal.  *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993).  We must determine whether the findings in turn support the conclusions of law and judgment.  *Nguyen*, 144 Wn.2d at 530.  Because the findings of fact are verities, we address only whether the findings of fact support MQAC's conclusions of law.

---

[10] Neravetla is actually challenging MQAC's conclusion of law and claiming that it does not flow from the findings of fact.

14

MQAC's conclusion of law 2.4 provides: "The Department proved by clear and convincing evidence that [Neravetla's] ability to practice with reasonable skill and safety was sufficient[ly] impaired by an occupational problem to trigger the application of RCW 18.130.170(1)." CP at 32.

Numerous findings support MQAC's conclusion of law. O'Connell, whose testimony MQAC adopted, described Neravetla as "bitterly angry, with little insight and little ability to reflect on his own behavior in relationships with others." CP at 25. MQAC also adopted the testimony of the WPHP evaluators in its findings. They experienced Neravetla to be "confused, defensive, angry, and upset, raising his voice with the interviewers." CP at 25. In addition, at Pine Grove, Anderson experienced Neravetla as "defensive, lacking insight, blame-shifting, and denying and minimizing how his internship was at risk at VMMC." CP at 26.

MQAC accepted the final opinion from Pine Grove that Neravetla had an occupational problem, disruptive physician behavior. MQAC found that this occupational problem interfered with Neravetla's ability to communicate and work with others, and if continued, it would impede his ability to practice medicine safely. His occupational problem rose to the level that patient care was affected. Accordingly, its conclusion of law that Neravetla's disruptive physician behavior, a mental condition, prevented him from practicing with reasonable skill and safety flows from the findings of fact.

Therefore, we conclude sufficient evidence exists to support MQAC's decision and order that Neravetla's ability to practice with reasonable skill and safety was sufficiently impaired by an occupational problem, disruptive physician behavior, to trigger the application of RCW 18.130.170(1).

V.    ARBITRARY AND CAPRICIOUS DECISION

Neravetla argues that MQAC's decision was arbitrary and capricious because it relied on unreliable hearsay and conflicting information to support its ruling. In addition, he argues the decision was arbitrary and capricious because the panel disregarded the testimony of his witnesses. He further argues that the panel arbitrarily discounted positive collateral information about him. We disagree with Neravetla and conclude that MQAC's order was not arbitrary and capricious.

Under RCW 34.05.570(3)(i), we shall grant relief from an agency order if the order is arbitrary and capricious. An agency order is arbitrary or capricious "if it is willful, unreasoning, and issued without regard to or consideration of the surrounding facts and circumstances." *Manke Lumber Co. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 113 Wn. App. 615, 623, 53 P.3d 1011 (2002). Action taken by a disciplinary board after giving a licensee ample opportunity to be heard, "'exercised honestly and upon due consideration,'" is not arbitrary and capricious even if an erroneous conclusion has been reached. *Keene v. Bd. of Accountancy*, 77 Wn. App. 849, 860, 894 P.2d 582 (1995) (quoting *Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 483, 663 P.2d 457 (1983)). The scope of review under this standard is "very narrow" and the party seeking to demonstrate that the action is arbitrary and capricious "must carry a heavy burden." *Pierce County Sheriff v. Civil Serv. Comm'n of Pierce County*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983).

Here, Neravetla argues that the order was arbitrary and capricious because MQAC found there was insufficient evidence to make a determination as to what actually happened in his residency, but then also found on the same information that he engaged in disruptive behavior. He also argues that the panel identified hearsay testimony about events that occurred during Neravetla's residency to be unreliable, but then made conclusions premised on the same information.

16

Although Neravetla does not identify the statements he challenges, our independent review of the record is that MQAC made the following finding of fact. "There was conflicting testimony, much of it hearsay, concerning [Neravetla's] conduct, performance, attendance, and professionalism while in the residency program at VMMC. With the exception of Dr. O'Connell's testimony, which the Commission finds credible, and [Neravetla's] own admission of missing certain classes, the Commission makes no finding regarding [Neravetla's] conduct during his residency except to note that [Neravetla] had difficulty in relationships with some of his supervisors." AR at 1604.

MQAC accepted Pine Grove's diagnosis that Neravetla had an occupational problem, disruptive physician behavior. Neravetla misinterprets MQAC's finding and what it was based on. Therefore, Neravetla's argument is without merit.

Next, Neravetla argues that the decision was arbitrary and capricious because MQAC disregarded the testimony of all of his expert witnesses. This argument is without merit, because we do not review credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).. The panel below is in the best position to determine whether a witness is credible. *See Camarillo*, 115 Wn.2d at 71. In addition, MQAC did find Neravetla and his witnesses to be credible, it just gave less weight to their testimony for reasons articulated in the final order. Regardless, even if the panel discounted favorable evidence, it may do so.

Neravetla fails to show the MQAC order is invalid for any reason specified by the controlling statute. Therefore, we conclude that the decision was not arbitrary and capricious.

VI.    APPEARANCE OF FAIRNESS DOCTRINE

Neravetla argues that the presiding officer violated the appearance of fairness doctrine by allowing a former employee of the involved hospital, Green, to remain on the panel.[11]  He argues that the presiding officer should have conducted an independent inquiry into whether Green could remain impartial.  We conclude that the presiding officer did not violate the appearance of fairness doctrine.

A medical professional's license represents a property interest and cannot be revoked without due process.  *Johnston*, 99 Wn.2d at 474.  A basic requirement of due process is a "'fair trial in a fair tribunal.'"  *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) (quoting *In re Matter of Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955)).  A biased decision maker violates this basic requirement, which applies to administrative agencies as well as courts.  *Withrow*, 421 U.S. at 47.  The appearance of fairness doctrine "provides additional protection because it requires that the agency not only act fairly but must also do so with the appearance of fairness."  *Clausing v. State*, 90 Wn. App. 863, 874, 955 P.2d 394 (1998).  Pursuant to this doctrine, a judge must recuse herself "if [she] is biased against a party or [her] impartiality may reasonably be questioned."  *State v. Dominguez*, 81 Wn. App. 325, 328, 914 P.2d 141 (1996).  However, a party claiming bias must produce "[e]vidence of a judge's actual or potential bias . . . before the appearance of fairness doctrine will be applied."  *Dominguez*, 81 Wn. App. at 329.

---

[11] Although Neravetla specifically argues that the presiding officer, and not Green, violated the appearance of fairness doctrine, his arguments seem to center on Green's involvement.  Even though Neravetla does not argue it, nothing in the record demonstrates that Green could not be fair and unbiased in hearing the evidence and deciding the case.

"Under the appearance of fairness doctrine, proceedings before a quasi-judicial tribunal are valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing." *Johnston*, 99 Wn.2d at 478. But the presumption is that administrative decision makers perform their duties properly and the party claiming a violation must present specific evidence to the contrary, not speculation. *Faghih*, 148 Wn. App. at 843.

Neravetla fails to demonstrate how the presiding officer violated the appearance of fairness doctrine. Although VMMC previously employed Green and he acknowledged he knew the names of some of the witnesses, Neravetla did not demonstrate that Green had an actual or potential bias. Accordingly, there is no evidence in the record to show that either the presiding officer or the panel was partial. Therefore, Neravetla's argument fails.

VII.    ERRORS BY PRESIDING OFFICER

Neravetla argues that the presiding officer committed multiple prejudicial errors including denying his motion for summary judgment, refusing to admit his experts' reports, and excluding probative evidence. We do not consider any of these arguments.

A.    MOTION FOR SUMMARY JUDGMENT

Neravetla argues that the presiding officer erred by denying his motion for summary judgment. Where a denial of summary judgment is based on existence of disputed material facts, we will not review it when raised after a trial on the merits. *Weiss v. Lonnquist*, 173 Wn. App. 344, 354, 293 P.3d 1264 (2013).

Here, the presiding officer denied Neravetla's motion for summary judgment because issues of material fact remained. MQAC held a trial on the merits of the issue thereafter. Therefore, we do not review MQAC's denial of the summary judgment motion.

B.        EXCLUSION OF EXPERTS' REPORTS

Neravetla argues that the presiding officer refused to allow him to submit three expert witnesses' reports as exhibits, and he would only allow the reports to be admitted if he did not conduct direct examination of his witnesses.

Despite Neravetla's assertions, he did not actually offer the reports into evidence. The presiding officer broached the topic on his own before Neravetla began presenting his case. But the presiding officer made no ruling on the reports' admission, and therefore, there is nothing for us to review. In addition, the presiding officer did not limit Neravetla's ability to conduct direct examination of his witnesses.

C.        OTHER EVIDENTIARY ISSUES

Neravetla argues that the presiding officer excluded probative evidence and that he prohibited him "from introducing into evidence various documents." Br. of Appellant at 49. Neravetla also argues that the presiding officer "allowed Department attorneys to utilize documents handed to them by VMMC's counsel" that were not disclosed to him beforehand.

Neravetla's brief cites to the record only in regard to the exclusion of testimony from one witness, Dr. John Roberts. Neravetla wanted to call Roberts as a rebuttal witness. The presiding officer asked him to make a proffer. Neravetla said that Roberts would testify consistently with other prior testimony that Neravetla was accepting of feedback. He claimed the testimony was to rebut the allegations by Anderson that Roberts did not know of Dipboye's concerns. The presiding officer did not allow him to testify because the testimony would not have been inconsistent with what Anderson testified to, and did not qualify as rebuttal testimony. Neravetla does not identify other documents he claims were excluded.

Neravetla does not cite to any law to support his arguments nor does he provide any reasoning as to why the presiding officer's actions were error. Accordingly, we do not consider the evidentiary issues. *Bercier v. Kiga*, 127 Wn. App. 809, 824, 103 P.3d 232 (2004); RAP 10.3(a)(6).

We affirm.

                                                           Melnick, J.

We concur:

Worswick, J.

Bjorgen, C.J.